United States District Court
District of New Jersey

UNITED STATES OF AMERICA          :    CRIMINAL COMPLAINT

    v.                              :

MOHAMED ALESSA and                :
CARLOS E. ALMONTE,                :
  a/k/a "OMAR"                    :    Magistrate No. 10-8109 (MCA)

    I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

    I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

                                       Samuel P. Robinson
                                       Special Agent, FBI

Sworn to and subscribed
in my presence

June 4, 2010                         Newark, New Jersey
Date                                  City and State


Hon. Madeline Cox Arleo, U.S.M.J.
Name/Title of Judicial Officer       Signature of Judicial Officer

## ATTACHMENT A

From in or around October 2006, through on or about June 5, 2010, in Hudson and Passaic Counties, in the District of New Jersey, and elsewhere, defendants MOHAMED ALESSA and CARLOS E. ALMONTE, a/k/a "OMAR," did, within the jurisdiction of the United States, willfully conspire with each other to commit at a place outside the United States an act that would constitute the offense of murder, kidnapping, and maiming if committed in the special maritime and territorial jurisdiction of the United States.

## OVERT ACTS

In furtherance of the conspiracy, and to effect the illegal objects thereof, one or more of the conspirators knowingly performed one or more overt acts, on or about the following dates, in the District of New Jersey, and elsewhere, within the United States:

1. On February 4, 2007, DEFENDANT MOHAMED ALESSA (hereinafter "ALESSA") and DEFENDANT CARLOS E. ALMONTE, a/k/a "OMAR" (hereinafter "ALMONTE") (collectively, the "DEFENDANTS"), traveled from the United States to Jordan aboard an airline flight departing from John F. Kennedy International Airport ("JFK Airport").

2. On March 1, 2008, at an outdoor facility in West Milford, New Jersey, the DEFENDANTS engaged in simulated combat using paintball guns.

3. On November 22, 2009, the DEFENDANTS traveled to an Army/Navy store in New York City where they each purchased a hydration system.

4. On November 29, 2009, in Jersey City, New Jersey, in the presence of ALMONTE, ALESSA stated, in part: "We'll start doing *killing*[1] here, if I can't do it over there."

5. On November 30, 2009, in Jersey City, New Jersey, ALESSA demonstrated and instructed ALMONTE and an undercover law enforcement officer (the "UC") regarding various hand-to-hand fighting tactics.

---

[1] In this Criminal Complaint, where English language words appear in *italics* they represent translations of words that were spoken in Arabic.

6. On December 6, 2009, in Jersey City, New Jersey, ALESSA demonstrated for the UC how to clear a room of adversaries using a simulated handgun and a flashlight in tandem.

7. On December 20, 2009, in New York, New York, ALESSA purchased a hydration system and other equipment.

8. On December 20, 2009, in New Jersey, the DEFENDANTS listened to a recording of Anwar al-Awlaki ("Awlaki") promoting violent jihad and martyrdom.

9. On January 3, 2010, in North Bergen, New Jersey, the DEFENDANTS physically trained by lifting weights, during which activity ALESSA stated, in substance and in part, that stronger muscles means bigger muscles which means killing more non-Muslims.

10. On January 3, 2010, in New Jersey, ALMONTE played, in the presence of the UC, a recording of Awlaki promoting violent jihad.

11. On January 6, 2010, in Jersey City, New Jersey, the DEFENDANTS discussed, in substance and in part, traveling abroad to wage violent jihad.

12. On January 20, 2010, in Jersey City, New Jersey, the DEFENDANTS joined a gym and physically trained by lifting weights together.

13. On January 20, 2010, in Jersey City, New Jersey, the DEFENDANTS discussed, in substance and in part, violent jihadist groups operating in Somalia.

14. On March 7, 2010, in New Jersey, ALESSA told ALMONTE and the UC, in substance and in part, that they should not include others in their plan to join Al-Shabaab in Somalia.

15. On March 20, 2010, in Jersey City, New Jersey, ALMONTE purchased airline tickets for himself and the UC departing the United States on June 5, 2010, bound for Cairo, Egypt.

16. On April 7, 2010, in Jersey City, New Jersey, ALMONTE gave the UC $2000 for deposit into an account that ALMONTE could access abroad.

17. On April 11, 2010, in North Bergen, New Jersey, the DEFENDANTS engaged in simulated combat using first-person-shooter computer software.

18. On April 27, 2010, in Jersey City, New Jersey, ALMONTE gave the UC $2000 for deposit into an account that ALMONTE could access abroad.

19. On May 9, 2010, in New Jersey, ALESSA told ALMONTE and the UC, in substance and in part, that he did not want to spend a lot of time in Egypt before leaving for Somalia. The DEFENDANTS also discussed traveling to Somalia by boat.

20. On May 16, 2010, in Jersey City, ALMONTE viewed a video posted on the Internet titled "First Stop Addis," depicting violent jihadists in Somalia carrying AK-47 assault rifles and rocket propelled grenade launchers.

21. On May 23, 2010, in New Jersey, ALMONTE went to a book store and attempted to find a Somali language phrase book.

22. On May 25, 2010, in Elmwood Park, New Jersey, ALMONTE played for ALESSA a video-recorded interview of Awlaki, during which Awlaki justified the killing of civilians in the course of waging violent jihad.

23. On June 2, 2010, in New Jersey, ALMONTE gave the UC $4100 for deposit into an account that ALMONTE could access abroad.

In violation of Title 18, United States Code, Section 956(a)(1).

## ATTACHMENT B

I, Samuel P. Robinson, am a Special Agent of the Federal Bureau of Investigation ("FBI"). I have personally participated in this investigation and am aware of the facts contained herein based on my own investigation as well as information provided to me by other law enforcement officers and my review of documents and records. Since this Affidavit is submitted for the sole purpose of establishing probable cause to support the issuance of a complaint, I have not necessarily included each and every fact known by the government concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Where statements of others are related herein, they are related in substance and part.

1. On October 9, 2006, a member of the public ("Individual 1") who knows the DEFENDANTS sent a tip through the FBI's website concerning the activities of the DEFENDANTS. In that electronic message, Individual 1 stated: "[e]very time they (referring to the DEFENDANTS)[2] access the Internet all they look for is all those terrorist videos about the Islam holly [sic] war and where they kill US soldiers and other terrible things. . . . They keep saying that Americans are their enemies, that everybody other than Islamic followers are their enemies . . . and they all must be killed."

2. On December 21, 2006, law enforcement personnel interviewed a member of Almonte's family (the "Family Member"). During the interview, the Family Member stated that when law enforcement interviewed ALMONTE outside his home on a previous occasion, ALESSA was hiding inside the house and, while in possession of a large knife, told the Family Member that he (ALESSA) would kill the agents if they entered the residence. The Family Member also told law enforcement that the DEFENDANTS watched a video on the computer about suicide vest bombs.

3. On February 2, 2007, Individual 1 told law enforcement that the DEFENDANTS would be flying from the United States to Jordan in the near future.

4. Official records reveal that on February 4, 2007, the DEFENDANTS traveled from the United States to Jordan. Customs

---

[2] In the Criminal Complaint, information appearing in parenthesis in quoted material is my belief based on my training and experience and knowledge of the investigation to date.

officers searched the DEFENDANTS' luggage prior to their departure from the United States. During the search, the officers observed three Camelbak® hydration systems,[3] flashlights, and camouflage clothing.[4]

5. On March 3, 2007, FBI personnel conducted a consensual search of ALMONTE's computer. The search revealed documents authored by Usama Bin Laden, Ayman Al-Zawahiri, and others advocating violent jihad against the perceived enemies of Islam, including the United States.

6. On March 1, 2008, at an outdoor facility in West Milford, New Jersey, the DEFENDANTS engaged in simulated combat using paintball guns.

7. In 2009, the UC met the DEFENDANTS and began spending time with them.

8. On November 22, 2009, the DEFENDANTS traveled to an Army/Navy store in New York City with the UC, where they each purchased a Camelbak® hydration system (3-liter capacity).

9. On November 29, 2009, in a recorded conversation, ALESSA stated to ALMONTE and the UC:

> A lot of people need to get killed, bro, swear to God . . . I have to get a . . . assault rifle and just kill anyone that even looks at me the wrong way, bro.
>
> Nah, I swear to God, bro. I wanna, like – I'm not – my – my soul cannot rest until I shed blood. I wanna, like, be the world's known terrorist . . . I swear to God . . .

---

[3] Based on my training and experience, Camelbak® is a company that makes equipment and gear for outdoor activities (including hiking and cycling) as well as for military and elite law enforcement applications. Camelbak® hydration systems are water receptacles that are designed to be worn comfortably on a person (typically upon one's back) and are widely used by U.S. military and elite law enforcement personnel.

[4] As described in paragraph 40, below, ALMONTE later revealed to an undercover officer the nature of his and ALESSA's trip to Jordan.

But, yanni, and if you think of it, I'm gonna get a *gun*. I'm the type of person to use it at any time. But, if I would've had a *gun*, I can't – I can't even – I'll – I'll have more bodies on it than – than the – than the hairs on my *beard*. You know what I'm saying? It's already enough, you don't worship Allah, so . . . that's a reason for you to die . . .

[W]e're being pushed by every corner of the earth, yanni. They only fear you when you have a *gun* and when you – when you start killing them, and when you – when you take their head, and you go like this, and you behead it on camera, and you – you have to be ruthless, bro. *I swear to God*, bro. Enough of this punk shit. It's that everyone has to be ruthless to – with these people. We'll start doing *killing* here, if I can't do it over there. I'm gonna get locked up in the airport? Then you're gonna die here, then. That's how it is. Freaking Major-Nidal-shaved-face-Palestinian-crazy guy;[5] he's not better than me. I'll do twice what he did.

10. On November 30, 2009, ALESSA stated to the UC that he (ALESSA) had binoculars and four tactical-brand flashlights.

11. On the same date, at the UC's residence in Jersey City, New Jersey, ALESSA demonstrated and instructed ALMONTE and the UC regarding various hand-to-hand fighting tactics, including the simulated killing of an armed guard with a knife.

12. On the same date, in a recorded conversation, ALESSA told the UC that "and whenever they think I'm leaving, they always think I'm gonna come back, yanni. I leave this time, *God Willing*, I never come back. I'll never see this crap hole. Only way I would come back here is if I was in the land of jihad and the *leader* ordered me to come back here and do something here. Ah, I love that."

13. On the same date, in a recorded conversation in Jersey City, New Jersey, ALESSA, upon seeing a fire hydrant, stated that if a fire were to break out in the city "*God Willing*, Allah makes it rain gasoline down on the that fire. Inflame it more. That'd be hot, to rain gasoline."

---

[5] Based on my training and experience, I believe that ALESSA is referring to Major Nidal Hassan, who has been charged with shooting and killing numerous individuals on November 5, 2009, at Fort Hood, Texas (the "Fort Hood Shooter").

14. On December 6, 2009, at the UC's residence in Jersey City, New Jersey, ALESSA demonstrated for the UC how to clear a room of adversaries using a simulated handgun and a flashlight in tandem.

15. On December 7, 2009, at the UC's residence in Jersey City, New Jersey, ALESSA showed the UC tactical-brand pants and discussed their useful features, including a pouch for carrying ammunition magazines.

16. On the same date, in a recorded conversation, ALESSA stated to the UC:

> We know what we have to do, and we're just gonna do it, *God willing*. We need to - we need to get out of here. We need to *do seriously*, yanni. You and Omar (referring to ALMONTE) have enough money, and you guys could pay for my ticket, and we could go. I have 700 bucks saved up. You guys have at least, each, six Gs. That's 12 in total, and you're allowed to leave with that much, you know? What's holding you back? What do you need? . . . [ALESSA lists equipment and apparel] . . . That's all you need, yanni. And then, you get your weapons when you get there . . . . And then, you kill *non-Muslims* and you take the *spoils of war*. The *leader* gets them (referring to weapons), and distributes it amongst the ranks. Best life.

17. On December 16, 2009, at the UC's residence in Jersey City, New Jersey, ALESSA showed the UC a camouflage folding knife and a camouflage tactical-brand flashlight. Alessa also stated that if law enforcement tried to arrest him, "I got a knife this big in my house, and whoever gets next to me, I'm a cut them in half with it, even if I die."

18. On December 20, 2009, ALESSA showed the UC another folding knife with a four-inch blade. ALESSA further told the UC that he (the UC) needed to get such a knife.

19. On the same date, the DEFENDANTS traveled to an Army/Navy store in New York City with the UC, where ALESSA: (1) purchased a desert-camouflage Camelbak® hydration system; (2) placed an order for a green-camouflage Camelbak® hydration system; and (3) purchased for ALMONTE a pair of camouflage pants at ALMONTE's direction.

20. On the same date, during a car ride, in the presence of ALESSA and the UC, ALMONTE played a recording stored on his

mobile telephone of Awlaki lecturing about the importance of violent jihad and the different types of martyrs.

21. On December 29, 2009, in New Jersey, in the presence of ALMONTE, ALESSA provided the UC with a Camelbak® hydration system.

22. On January 3, 2010, the DEFENDANTS physically trained by lifting weights together and with the UC at a gym in North Bergen, New Jersey. During their weight-lifting session, ALESSA stated that stronger muscles means bigger muscles which means killing more non-Muslims. On numerous other occasions, the DEFENDANTS lifted weights and engaged in other forms of physical training together and/or with the UC.

23. On the same date, during a car ride in New Jersey, in the presence of the UC, ALMONTE played a recording stored on his mobile telephone of Awlaki reading and expanding upon a lecture, titled "Constants on the Path to Jihad." During the recording, Awlaki emphasized that an individual need not rely on others or have a leader in order to wage violent jihad.

24. On January 6, 2010, the DEFENDANTS and the UC discussed traveling abroad to wage violent jihad. ALESSA identified multiple locations. After ALESSA described the options, the DEFENDANTS chose to travel to Egypt in furtherance of their agreement to wage violent jihad abroad.

25. During that same conversation, the DEFENDANTS and the UC discussed whether to buy one-way or round-trip tickets. They stated:

| | |
|---|---|
| ALESSA: | Listen, listen, hey, hey. Another thing. |
| ALMONTE: | Huh? |
| ALESSA: | Ticket, round-trip or one-way? |
| ALMONTE: | Round-trip. |
| UC: | Round. |
| ALMONTE: | Definitely. |
| ALESSA: | Round, that's all right. |
| UC: | Yeah. |
| ALMONTE: | Yes, (UI). |
| ALESSA: | I'm not gonna use the other way. |
| ALMONTE: | It doesn't matter. Don't risk it, bro. |
| ALESSA: | That's like six-hundred more. |
| ALMONTE: | It's enough of a risk trying to fly out of here . . . . |

26. On January 13, 2010, during a car ride in New Jersey, ALESSA played an audio recording for the UC that included the sounds of automatic-weapons fire, explosions, and screams, over which two Arabic speakers called upon the listeners to wage violent jihad. Later on, ALESSA played videos stored on his mobile telephone depicting violent jihadist training.

27. On January 17, 2010, at the UC's residence in Jersey City, New Jersey, in the presence of ALESSA and the UC, ALMONTE practiced various shooting and crawling positions using a paintball gun.

28. On the same date, ALESSA provided instruction to ALMONTE and the UC regarding: (1) how they should love believers of Islam and hate non-Muslims; (2) the enemies of Allah, specifically: (a) the devil; (b) one's self; (c) non-believers; (d) hypocrites; (e) Jews; and (f) Christians; and (3) the importance of waging violent jihad.

29. On January 20, 2010, in a recorded conversation, the DEFENDANTS signed-up for memberships at a gym in Jersey City, New Jersey. ALESSA intentionally avoided giving his mobile telephone number as part of his application. The DEFENDANTS then physically trained by lifting weights together and with the UC at the gym.

30. On the same date, in a recorded conversation, ALMONTE identified and described to ALESSA and the UC various violent jihadist groups that were operating in Somalia, including Al-Shabaab, Hizbul Islam, and Ahlu Sunna wa'l Jama'a. ALMONTE stated: "But Shabaab is the main one, yanni. The main thing."

31. On January 25, 2010, in a recorded conversation, the UC asked ALMONTE what group ALMONTE thought they would be with when they arrived in Somalia and referenced that ALMONTE had previously mentioned Al-Shabaab. ALMONTE stated, "it has to be them."

32. On the same date, in a recorded conversation, ALMONTE told the UC he was nervous about carrying the approximately $7000 that he (ALMONTE) had saved for violent jihad when they travel abroad. The UC offered to allow ALMONTE to deposit his money into a bank account that contained the UC's savings which ALMONTE could use to access his (ALMONTE's) money in Egypt. ALMONTE subsequently agreed to give the UC his money to deposit into the that account (the "Combined Bank Account") for the purpose of making it accessible to him abroad.

33. On January 31, 2010, in a recorded conversation, ALMONTE stated that he had read about the life of Abu Mansoor. Based on my training and experience, I believe that ALMONTE was referring to Omar Hammami, a/k/a "Abu Mansoor Al-Amriki," an American-born member of Al-Shabaab, whose radicalization and participation in Al-Shabaab has been the subject of extensive media coverage. The UC asked if ALMONTE thought they would see Abu Mansoor when they reached Somalia. ALMONTE responded "*God Willing.*"

34. On the same date, in a recorded conversation, ALESSA stated: "we're all going to see Samia right?" The UC responded, "Yeah." According to the UC, ALESSA used "Samia" to refer to Somalia.

35. On the same date, in a recorded conversation, ALMONTE commented how law enforcement wanted to put them (the DEFENDANTS) behind bars. ALMONTE then stated:

> ALMONTE: We're all innocent of everything. We don't wanna hurt this country. For what, yanni, I was born here, you know, raised here. I just want the troops to come back home safely and cozily.
> ALESSA: In body bags, in caskets.
> ALMONTE: In caskets.
> ALESSA: Sliced up in 1,000 pieces *cozy in the grave, in hell*.

36. On the same date, at the UC's residence in Jersey City, New Jersey, in the presence of ALMONTE, ALESSA showed the UC camouflage combat boots he recently purchased, as well as a small sword in his possession.

37. On the same date, at the UC's residence in Jersey City, New Jersey, in the presence of ALESSA, ALMONTE showed the UC a written copy of "Constants on the Path to Jihad," which ALMONTE stated was the written foundation for the audio lecture by Awlaki that ALMONTE had previously played for the UC.

38. On the same date, in a recorded conversation, the DEFENDANTS and the UC discussed what it would be like for them on the battlefield:

> ALESSA: What if there was like a battle, and, like, Omar (referring to ALMONTE) was, like, hiding and we were just having a meal?
> ALMONTE: I know I'm not gonna do that in a battle.

```
ALESSA:    I told.  I'll have your back, like, publicly.
ALMONTE:   You could barely pray in battle.  How we
           gonna eat?
UC:        Yeah. I'll be like, "Omar, share, yo.  Move
           over a little bit."
ALMONTE:   Yeah. Yeah.
```

39. On February 3, 2010, the DEFENDANTS physically trained by lifting weights together and with the UC at a gym in Jersey City, New Jersey. They also discussed what type of physical training they should do in furtherance of their agreement to wage violent jihad abroad.

```
ALESSA:    Anyway, but that (referring to cardiovascular
           exercise) - that you could do anywhere.  You
           could - I could take advantage of that
           anywhere.  Take advantage of the weights,
           because there's not gonna be weights there.
           The only -
ALMONTE:   All right, you.
ALESSA:    - the only weights -
ALMONTE:   If you wanna do -
ALESSA:    - is gonna be your Kalashnikov.⁶
```

40. On the same date, in a recorded conversation, ALMONTE told the UC that when the DEFENDANTS traveled to Jordan three years ago, they tried to be recruited as mujahideen fighters, but were denied the opportunity and were upset at the individuals who failed to recruit them.

41. On February 11, 2010, at ALESSA's residence in North Bergen, New Jersey, ALESSA played a compilation of violent jihadist videos depicting scenes from Iraq, which included attacks on a tank and a Humvee, and footage of uniformed personnel being killed.

42. On the same date, at ALESSA's residence in North Bergen, New Jersey, ALESSA showed the UC a set of Russian-made night-vision binoculars and a tactical-brand flashlight. ALESSA stated that he was not going to travel with the night vision binoculars because, among other reasons, he might be questioned by authorities about them.

---

[6] Based on my training and experience, when ALESSA stated "Kalashnikov" he was referring to an AK-47 assault rifle, which is a type of weapon that is used by, among others, Al-Shabaab fighters in Somalia.

43. On March 7, 2010, the DEFENDANTS physically trained by hiking in snow and mud with the UC at Garrett Mountain Reservation in Passaic County, New Jersey.

44. On the same date, in a recorded conversation, ALESSA told ALMONTE and the UC that they should not include others they knew in New Jersey in their plan to travel to Somalia and join Al-Shabaab to wage violent jihad. ALESSA stated that, in contrast to other individuals, he (ALESSA), ALMONTE, and the UC were serious about their plan and were preparing for it.

45. On March 9, 2010, at the UC's residence in Jersey City, New Jersey, ALESSA viewed internet video that included Adam Gadahn speaking about violent jihad and praising the Fort Hood Shooter.[7]

46. On March 10, 2010, ALMONTE physically trained by lifting weights with the UC at a gym in Saddle Brook, New Jersey. While they were training, ALMONTE stated that he would pay $350 more for a flight departing from JFK Airport, as opposed to a less expensive flight departing from Newark because the former is a direct flight to Egypt and the latter would require a connecting flight. Based on my training and experience, a direct flight would lower the risk to DEFENDANTS as they would not have to interact with another airport and its security.

47. On the same date, ALESSA stated he wanted to set a date for their travel to wage violent jihad without further discussion or delay.

48. On March 20, 2010, at the UC's residence in Jersey City, New Jersey, in the UC's presence, ALMONTE selected and purchased two round-trip airline tickets for himself and the UC departing JFK Airport on June 5, 2010 for Egypt, with a return reservation for July 11, 2010. The purchases were made with a

---

[7] Based on my training and experience, Adam Gadahn, a/k/a "Adam Pearlman," a/k/a "Azzam al-Amriki," is an American-born senior Al-Qaeda operative. Gadahn is an English-speaking spokesman for Al Qaeda, and has appeared in numerous recruiting and propaganda videos released by As Sahab, which is the media wing of Al Qaeda. In one such video, released a few days prior to this conversation, Gadahn called on Americans to wage violent jihad and praised the Fort Hood Shooter as "a pioneer, a trailblazer, and a role model who has opened a door, lit a path, and shown the way forward for every Muslim who finds himself among the unbelievers . . . ."

debit card that was linked to the Combined Bank Account, which then contained the savings of the UC and later the savings of ALMONTE.

49. On the same date, at the UC's residence in Jersey City, New Jersey, ALMONTE viewed an Internet video depicting the Jordanian suicide bomber responsible for the attack on Central Intelligence Agency personnel near Khost, Afghanistan on December 30, 2009.

50. On March 23, 2010, at the UC's residence in Jersey City, New Jersey, in the presence of the UC, ALMONTE informed ALESSA that he (ALMONTE) and the UC had reserved seats on a flight to Egypt departing on June 5, 2010.

51. On March 28, 2010, at the UC's residence in Jersey City, New Jersey, ALMONTE stated that it would look strange for three bearded males to do training outdoors (referring to himself, ALESSA, and the UC). ALMONTE further stated that the criminal defendants who were convicted of plotting an attack on Fort Dix, in New Jersey, were caught after they had trained outdoors.

52. On the same date, in a recorded conversation, ALMONTE told the UC that:

> [I]n this situation, any Muslim that gets an opportunity, or a chance, or a mere chance, or a slight, chance, or even ten-percent out of one-hundred chance of making it there (referring to waging violent jihad abroad), should - should risk it . . . . Because what's better than sitting back here and working like a dog and . . . being somebody's puppy, basically what I call it, than moving forward to, yanni, a life of honor, life of dignity, once Allah . . . takes your soul upon that.

53. On March 31, 2010, in Garfield, New Jersey, in the presence of the UC, ALESSA talked with his father about having his father purchase for ALESSA an airline ticket to Egypt, purportedly for ALESSA to attend school there.

54. On April 1, 2010, the DEFENDANTS and the UC discussed their travel plans to Egypt and from there to Somalia.

55. On April 4, 2010, at a store in Jersey City, New Jersey, ALMONTE and the UC engaged in simulated combat using

14

first-person-shooter computer software. ALMONTE asked the store clerk for particular a first-person-shooter program that simulates combat in Somalia, but was told the store did not have that title.[8]

56. On April 7, 2010, at the UC's residence in Jersey City, New Jersey, ALMONTE gave the UC $2000 with instructions for the UC to deposit it into the Combined Bank Account so the money would be accessible to ALMONTE when he traveled overseas with the UC.

57. On April 11, 2010, at a store in North Bergen, New Jersey, the DEFENDANTS and the UC engaged in simulated combat using first-person-shooter computer software. They used fictitious sign-in names and, at ALESSA's direction, conducted the simulation in the role of terrorists.

58. On the same date, ALESSA listed for ALMONTE and the UC what gear they would need to bring abroad in furtherance of their plan to wage violent jihad.

59. On April 14, 2010, ALESSA and the UC spoke about how long they would be in Egypt prior to traveling to Somalia. ALESSA stated that he wanted to wait long enough to allow him to bring more people from Egypt to Somalia.

60. On April 15, 2010, ALESSA informed the UC that his (ALESSA's) parents had made a reservation for him (ALESSA) to fly from JFK Airport to Cairo, Egypt on June 5, 2010.

61. On April 18, 2010, at the UC's residence in Jersey City, New Jersey, ALMONTE gave the UC $200 with instructions for the UC to deposit it into the Combined Bank Account, consistent with their arrangement that ALMONTE would be able to access the money when they are overseas.

62. On April 19, 2010, at ALESSA's residence in North Bergen, New Jersey, ALESSA viewed online videos regarding Al-Shabaab, including one depicting a government soldier who absconded from the military in order to join the terrorist group, and brought the group a large number of new AK-47

---

[8] Based on my training and experience, first-person-shooter software allows a user to operate from the perspective of a soldier, terrorist, or other character and, using a variety of realistic weapons, simulate combat experiences, including sniping, close-quarters battle, ambushes, and flanking tactics.

assault rifles. As the video played, ALESSA stated that he could not wait to go there and wanted one of the new AK-47 assault rifles, not an older one from the 1980s.

63. On April 25, 2010, at a store in North Bergen, New Jersey, the DEFENDANTS and the UC engaged in simulated combat using first-person-shooter computer software. They used fictitious sign-in names and, at ALESSA's direction, conducted the simulation in the role of terrorists.

64. On the same date, at the UC's residence in Jersey City, New Jersey, ALMONTE accessed Internet videos, one of which depicted violent jihadists in Iraq killing Iraqi government soldiers, and another which depicted a violent jihadist sniper killing an individual.

65. On the same date, in a recorded conversation ALMONTE stated that there would soon be American troops in Somalia which was good because it would not be fun to kill only Africans.

66. On April 27, 2010, at the UC's residence in Jersey City, New Jersey, ALMONTE gave the UC $2000 with instructions to deposit the money into the Combined Bank Account consistent with their arrangement that ALMONTE would be able to access the money when they are overseas. ALMONTE also gave a piece of luggage to the UC to hold at his residence for safekeeping.

67. On May 2, 2010, at a shopping mall in Central Valley, New York, ALMONTE and the UC each purchased a pair of cargo pants.

68. On May 9, 2010, the UC met with the DEFENDANTS. The DEFENDANTS stated that any Muslim who thought the Times Square bombing was wrong was a *non-Muslim*.

69. On the same date, ALESSA stated that he did not want to spend much time in Egypt before leaving for Somalia. The DEFENDANTS and the UC also discussed how they would travel by boat to Somalia and would need to avoid bad weather.

70. On the same date, ALESSA asked ALMONTE and the UC how they would react if they were told, only a day after arriving in Egypt, that they had to leave for Somalia. ALMONTE responded that he had been waiting for three years for this opportunity and that he would seize it. ALESSA stated that he too would go onward to Somalia.

71. On May 12, 2010, the DEFENDANTS and the UC went to two sporting goods stores in Paramus, New Jersey. While in one of the stores, ALESSA directed the UC to purchase a particular type of hiking boots, a synthetic-fabric shirt, and synthetic-fabric socks. The DEFENDANTS also each purchased a synthetic-fabric shirt, and ALESSA purchased two pairs of synthetic-fabric socks. ALESSA informed the UC that all the UC still needed was a cleaning kit for his Camelbak® hydration system. The purchases were made with a debit card linked to the Combined Bank Account.

72. On May 16, 2010, at the UC's residence in Jersey City, New Jersey, ALMONTE used the UC's computer to view Internet videos, including a video featuring Abu Mansoor Al-Amriki, the aforementioned American-born Al-Shabaab fighter. The video featured images of Al-Shabaab fighters carrying AK-47s with narration that glorified martyrdom and waging violent jihad in Afghanistan, Chechnya, Iraq, and Somalia.

73. On May 23, 2010, ALMONTE went to a book store in New Jersey with the UC where he (ALMONTE) attempted to find a Somali language phrase book. Later ALMONTE stated to the UC that if he (ALMONTE) found such a book he would memorize its contents and then dispose of it before traveling on June 5th.

74. On May 25, 2010, at ALMONTE's residence in Elmwood Park, New Jersey, ALMONTE played for ALESSA and the UC an Internet video depicting an interview with Awlaki, during which Awlaki justified the killing of civilians in the course of waging violent jihad.

75. On June 2, 2010, in New Jersey, ALESSA discussed with the UC the timing and means of their travel from Egypt to Somalia. During this conversation, ALESSA asked the UC if they (referring to ALESSA, ALMONTE, and the UC) would be given weapons during their trip from Egypt to Somali.

76. On the same date, in New Jersey, ALMONTE gave the UC $4100 with instructions for the UC to deposit it into the Combined Bank Account so the money would be accessible to ALMONTE when he traveled overseas with the UC. ALMONTE further instructed the UC to have $1100 of that money ready for ALMONTE on June 5th.

77. Flight reservations records reveal that ALESSA and ALMONTE are scheduled to travel directly from the United States to Egypt aboard separate airline flights, both of which are due to depart from JFK Airport on the evening of June 5, 2010.