UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA          :          Hon. Dickinson R. Debevoise
                                                         :
                                                         :          Crim. No. 11-132 (DRD)
                        v.                              :
                                                         :
CARLOS E. ALMONTE,                     :
              a/k/a "Omar"                        :


UNITED STATES OF AMERICA          :          Crim. No. 11-133 (DRD)
                                                         :
                                                         :
                        v.                              :
                                                         :
MOHAMED ALESSA                         :


---

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
FOR RECONSIDERATION OF FINAL SENTENCE

---

PAUL J. FISHMAN
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700


On the Memorandum:

L. Judson Welle
Andrew D. Kogan
Assistant U.S. Attorneys

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.     The Defendants' Claims Are Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       A.     The Conduct of the Prosecutors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       B.     The Conduct of the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.    The Defendants' Motion Is Barred on Procedural Grounds . . . . . . . . . . . . . . . . . . . 8

       A.     The Motion Fails to Demonstrate a
              Legal Basis to Modify an Imposed Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       B.     The Defendants' Waived the Right
              to Challenge a Sentence of 30 Years or Less . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## PRELIMINARY STATEMENT

On April 15, 2013, this Court sentenced defendants Mohamed Alessa and Carlos E. Almonte to terms of imprisonment of 22 years and 20 years, respectively.  The Court did so after carefully considering the written submissions of the parties, the oral arguments presented by counsel, and the defendants' statements made during the sentencing hearing.

Notwithstanding the care with which the Court imposed the sentences, the defendants now seek reconsideration on the claim – thoroughly manufactured out of thin air – that the bombings at the Boston Marathon improperly influenced both the government's sentencing presentation and the Court's decision.  In support of this fanciful concoction, the defendants allege that the government changed its sentencing presentation mid-stream after receiving a note describing what had happened in Boston.  In particular, the defendants allege that one of the AUSAs, after silently reading the note to himself, abruptly changed the focus of his argument from the history and characteristics of the defendants to the need to deter violent acts by homegrown violent extremists and the vulnerability of this region to such attacks.  Moreover, the defendants contend the Court too was swayed by the bombings in Boston.

The defendants' allegations are as false as they are sensational:  the transcript of the sentencing hearing confirms that the arguments about deterrence were completed before either of the AUSAs received any news of the Boston bombings.  Had the defendants bothered to obtain the transcript, they would have realized that their claim – purportedly documented in their notes – was entirely imaginary.  Moreover, the Court has already stated, unequivocally, that the bombings in Boston did not affect its decision.  Finally, the defendants' motion is barred by federal law and by the terms of their plea agreements.  Accordingly the motion should be denied.

## BACKGROUND

On March 3, 2011, defendants Mohamed Alessa ("Alessa") and Carlos E. Almonte ("Almonte") jointly appeared before this Court and, pursuant to plea agreements, pled guilty to separate one-count Informations charging conspiracy to murder persons outside the United States, in violation of 18 U.S.C. § 956(a).[1]  On January 11, 2013, this Court entered orders scheduling the defendants' sentencing hearing for April 15, 2013.

Prior to the hearing, the parties submitted extensive memoranda, reports, and other materials in support of their respective positions.  As contemplated by the plea agreements, Alessa and Almonte requested 15-year terms of imprisonment, while the government requested 30 years' imprisonment for each of them.  The government's papers expressly and properly included an argument that 30-year sentences would deter other individuals "who would contemplate committing ideologically motivated murder and violence . . . ."  (Govt. Consolidated Sentencing Mem. at 38).  Moreover, the government's papers cited numerous recorded statements of the defendants indicating that they approved of and desired to commit killings within the United States based on their extremist ideology.  (*Id.* at 35-38).

During the morning session of the sentencing hearing on April 15, 2013, defense counsel and the defendants addressed the Court and advocated in favor of the 15-year term.  After a lunch recess, AUSA L. Judson Welle presented arguments concerning the factors set forth in 18 U.S.C. § 3553(a) that were common to both defendants, including the need for the sentences to afford adequate deterrence to criminal conduct.  Specifically, AUSA Welle asked the Court to

---

[1]  The parties stipulated in the plea agreements that the applicable advisory Guidelines range was 360 months (*i.e.*, 30 years) to life imprisonment.

consider the need to deter homegrown violent extremists from attacking targets in the United States and emphasized the vulnerability of this District and surrounding region to such attacks.

At the conclusion of AUSA Welle's argument, AUSA Andrew D. Kogan[2] addressed the Court and discussed the history and characteristics of the defendants. During AUSA Kogan's argument, a Special Agent of the Federal Bureau of Investigation handed AUSA Welle – who was seated at counsel table – a note advising that two explosions had occurred at the finish line of the Boston Marathon and that initial reports indicated multiple fatalities. AUSA Welle silently read the note, rose from counsel table, and placed the note on the podium from which AUSA Kogan was addressing the Court. After silently reading the note himself, AUSA Kogan resumed his arguments related to the history and characteristics of the defendants. Neither prosecutor made any argument to the Court based on the events in Boston. Nor did AUSA Kogan reiterate the deterrence argument that Mr. Welle had already made.

The Court took a brief recess of no more than 20 minutes after the government's arguments. Upon returning to the bench, the Court provided the parties with copies of a 43-page Statement of Reasons explaining its sentences. The Court then sentenced Alessa to 22 years' imprisonment and Almonte to 20 years' imprisonment.

A few hours after the sentencing hearing concluded, counsel for Alessa sent an e-mail to the Court's deputy clerk requesting a conference to discuss defense counsel's concern that the Boston events had improperly influenced the sentences imposed.

---

[2] AUSA Kogan is the Chief of this Office's National Security Unit, as well as the Anti-Terrorism Advisory Council Coordinator for the District of New Jersey. In those roles, he coordinates and supervises counter-terrorism investigations in partnership with the Federal Bureau of Investigation's Joint Terrorism Task Force.

On April 16, 2013, the Court denied defense counsel's request for a conference, a decision that was relayed in an e-mail from the Court's deputy clerk.  Also that day, the Court signed judgments of conviction for both Alessa and Almonte.

On April 17, 2013, counsel for Alessa and Almonte requested a two-week stay of the judgments of conviction in a letter sent by Almonte's counsel.

On April 18, 2013, the Court filed a letter declining to stay the imposition of the sentences.  In the letter, the Court advised that "I first learned of the Boston events when someone mentioned them to me as I was about to reenter the courtroom to impose a final sentence."  The Court stated unambiguously that "the Boston events had nothing to do with the sentence I imposed."

Judgments of conviction were entered on the docket on April 18, 2013, for Alessa and April 19, 2013, for Almonte.

On April 29, 2013, counsel for Alessa and Almonte filed the instant motion to reconsider the sentences.

## DISCUSSION

## I.    The Defendants' Claims Are Without Merit

The defendants' motion alleges that the conduct of the prosecutors and the Court at the sentencing hearing violated their rights.  These allegations are without merit.

### A.    The Conduct of the Prosecutors

The defendants' motion asserts that the prosecutors colluded to improperly use the news of the Boston bombings to their advantage during the sentencing hearing.  (Defs. Mem. of Law at 2-4, 7-10).  The lynchpin of this claim is defense counsel's "recollection" that AUSA Kogan – upon receiving a note from AUSA Welle about the Boston events – "abruptly shifted" his arguments away from the history and characteristics of the defendants to the need to deter violent attacks by homegrown violent extremists and the vulnerability of this region to such attacks.  (*Id.* at 3; *see id.* at 2-4, 7-10).  In particular, the defense submission conjures that AUSA Kogan

> began to describe in specific terms the vulnerability of the American urban environment to terrorist attack—the Government cited the streets, bridges, tunnels and public spaces of American cities; it made an appeal in dramatic, inflammatory terms to the necessity of safeguarding the domestic, public environment from the Defendants; and it argued that any sentence to be imposed must deter others from carrying out domestic attacks against citizens in Newark and elsewhere.

(Def. Mem. of Law at 3).

The transcript of the proceedings confirms that these assertions in the defendants' brief are pure and irresponsible fancy.  At no point did AUSA Kogan's arguments "shift" from the history and characteristics of the defendants' into other areas, much less into an "inflammatory"

5

appeal for deterrence.  (Transcript of Sentencing on 04/15/2013, at 117:08 - 130:17).[3]  To the

contrary, AUSA Kogan never discussed either:  (1) the need for the sentences to deter

homegrown violent extremists from attacking the United States; or (2) the vulnerability of this

region to such attacks.  (*Id.*)  Instead, AUSA Kogan addressed only the defendants' history and

characteristics, including their prior acts of violence, their mental condition, their rejection of

family and jobs in favor of seeking to murder disbelievers in Islam, and Alessa's lack of

acceptance of responsibility and blame-shifting.  (*Id.*)  All of AUSA Kogan's arguments were

focused on 18 U.S.C. § 3553(a), which requires the Court to consider the "history and

characteristics of the defendant" in determining the sentence.

Had defense counsel bothered to obtain the transcript of the sentencing hearing they

would have seen that it was AUSA Welle – earlier in the afternoon and prior to receiving any

news of the Boston events – who argued that foreign terrorist organizations are encouraging

violent extremists like the defendants to undertake attacks in the United States (*id.* at 113:12 -

114:08), and that this region is especially vulnerable to such attacks due its population density,

critical infrastructure, and landmarks (*id.* at 114:09 - 115:14).  The defense narrative that AUSA

Kogan made these arguments after receiving a note from AUSA Welle about the Boston events

is, like so many other accusations of government misconduct made by the defense in this case, a

work of fiction.

Nor were AUSA Welle's arguments unfair or surprising.  In imposing sentence, the Court

is obligated to consider the need to afford adequate deterrence.  *See* 18 U.S.C. § 3553(a)(2)(B).

---

[3] Attached are the pages of the transcript that document the prosecutors' arguments at the
sentencing hearing.

And the government emphasized precisely that point a month earlier in its sentencing brief, which urged the Court to "send a strong message to those who contemplate committing ideologically motivated murder and violence that they will receive certain and serious consequences for conspiring to do so." (Govt. Consolidated Sentencing Mem. at 38). That submission also highlighted numerous statements of the defendants that they desired to kill disbelievers in Islam within the United States (*see id.* at 35-38), including Alessa's statement on November 29, 2009, that he and Almonte would "start doing *kutel* (*transl*. "killing") here, if I can't do it over there." (*Id.* at 35). While the defense is free to contest the significance of such statements, it cannot simply pretend that the defendants never made them. In short, AUSA Welle's arguments were entirely appropriate.

### B. The Conduct of the Court

The defendants allege that the Court violated its sworn duty to fairly and dispassionately sentence them because it pronounced the sentences a few minutes after learning that explosions had occurred in Boston. (Defs. Mem. of Law at 13-14). This claim is also without merit. There is nothing that indicates the Court made a spontaneous decision influenced by the news out of Boston.[4] Indeed, the Court's 43-page Statement of Reasons demonstrates that the Court's sentences were the result of thorough and painstaking consideration of the factual record, as well as the written and oral arguments of all counsel. The Court decisively put to rest any speculation to the contrary in its letter filed on April 18, 2013: "the Boston events had nothing to do with the sentence I imposed." With no foundation, the defense blithely attacks the good faith and veracity of the Court's explanation. (Def. Mem. of Law at 13-14 ("[N]o matter how sincere and

---

[4] At the time the Court sentenced the defendants, the cause of the explosions in Boston was still unclear.

seasoned the sentencing court, it cannot be said with any certainty that the Court was able to 'purge' the horrific news from its mind prior to imposing sentences for these two Defendants convicted of the crimes of terrorism").   That contention is absurd.

Accordingly, the government respectfully requests that the Court deny the defendants' motion on the merits.

## II.    The Defendants' Motion Is Barred on Procedural Grounds

### A.    The Motion Fails to Demonstrate a Legal Basis to Modify an Imposed Sentence

The defense submissions fail to explain how this motion falls within any recognized exception to the statutory rule that – once imposed – sentences are final and cannot be modified. The principle of finality in sentencing was codified in the Sentencing Reform Act of 1984 in 18 U.S.C. § 3582(c), which provides that " [t]he court may not modify a term of imprisonment once it has been imposed except [under specified circumstances]."  18 U.S.C. § 3582(c). "Section 3582(c) provides for very specific and limited circumstances under which a court may modify a sentence after it has been imposed."  *United States v. Washington*, 549 F.3d 905, 914-17 (3d Cir. 2008); *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008); *see United States v. Higgs*, 504 F.3d 456, 459, 464 (3d Cir. 2007).  Thus, under § 3582(c), "[i]n the sentencing context, there is simply no such thing as a 'motion to reconsider' an otherwise final sentence."  *United States v. Dotz*, 455 F.3d 644, 648 (6th Cir. 2006); *accord United States v. Austin*, 217 F.3d 595, 597 (8th Cir. 2000); *United States v. Barragan-Mendoza*, 174 F.3d 1024, 1028-30 (9th Cir. 1999).[5]

---

[5] In a recent unpublished decision, *United States v. Bennett*, 2013 WL 563349 (3d Cir. Feb. 15, 2013) (per curiam), the Third Circuit observed that motions for reconsideration are available in criminal cases, but also recognized that 18 U.S.C. § 3582(c) imposes strict limits on the circumstances in which a final sentence can be modified.  In *Bennett*, the defendant filed a

The defendants have not shown that any of the "very specific and limited circumstances" in which a court may modify an imposed sentence apply here.  For instance, the motion does not seek to correct an alleged "arithmetical, technical, or other clear error."  *See* Fed. R. Crim. P. Rule 35(a); 18 U.S.C. § 3582(c)(B).  Further, the motion has neither been brought by the government to reduce a sentence based on substantial assistance in the investigation of prosecution of another person – *see* Fed. R. Crim. P. 35(b) – nor one made by the Bureau of Prisons to reduce a custodial term due to an "extraordinary and compelling reason" or the advanced age of an inmate.  *See* 18 U.S.C. § 3582(c)(1).  Finally, the motion does not seek a reduction based on a change to the sentencing guidelines.  *See* 18 U.S.C. § 3582(c)(2).

Defense counsel's memorandum of law in support of the motion tellingly ignores 18 U.S.C. § 3582(c).  Instead, it cites inapposite cases arising from a variety of procedural contexts – not one of which involved a motion to modify a finally imposed sentence on grounds

---

motion in the district court to reduce his sentence on one of the grounds authorized in § 3582(c). After the district court denied the motion, the defendant moved for reconsideration of that decision. The court denied the motion to reconsider ruling that:  (1) motions to reconsider are available only in civil cases; and, in the alternative, (2) the defendant did not qualify for a reduction as a substantive matter.  *Id.* at *2.  On appeal, the Third Circuit affirmed, though it disagreed with the view that a motion for reconsideration is available only in civil cases, stating: "Courts have inherent authority in criminal matters to decide motions for reconsideration or rehearing and have repeatedly exercised that authority in the context of § 3582 proceedings." *Id.*; *accord United States v. Fiorello*, 337 F.3d 282, 286 (3d Cir. 2003) ("[M]otions for reconsideration may be filed in criminal cases").  Although at first blush this statement might suggest that district courts have the authority to entertain motions to modify sentences on grounds beyond those set forth in § 3582(c), a thorough reading of *Bennett* shows that they do not.  Indeed, the cases relied upon in *Bennett* for the "inherent authority" proposition all recognized the principle of finality embodied in § 3582 and that the exceptions to it are limited and specific.  Moreover, in affirming the district court's denial of the defendant's motion to reconsider, *Bennett* itself recognized that "§ 3582(c) provides limited circumstances by which a criminal sentence may be modified."  *Bennett*, at *2.  In sum, *Bennett* does not provide a basis for the court to modify a sentence beyond the circumstances recognized in § 3582(c).

beyond the scope of the exceptions set forth in § 3582(c), as is the case here.   Indeed, the memorandum concedes that its cases are not on point.  (*See* Defs. Mem. of Law at 7).

In summary, because none of the recognized exceptions apply, the defendant's motions should be denied under the rule of finality embodied in 18 U.S.C. § 3582(c).

**B.    The Defendants' Waived the Right
to Challenge A Sentence of 30 Years or Less**

In addition, the Court should deny defendants' motion for reconsideration because it contradicts the terms of defendants' plea agreements.  Courts have consistently enforced waiver provisions in plea agreements.  *See, e.g.*, *United States v. Khattak*, 273 F.3d 557 (3d Cir. 2001). In their respective plea agreements, and in return for concessions by the government, Alessa and Almonte both agreed as follows:

> [The defendant] knows that he has and, except as noted below in this paragraph, voluntarily waives, the right to file any appeal, any collateral attack, *or any other writ or motion*, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, *which challenges the sentence imposed by the sentencing court if the Court sentences the defendant to a term of imprisonment of thirty (30) years or less*.

(Plea Agreement re: Mohamed Alessa, Stipulation 10; Plea Agreement re: Carlos E. Almonte, Stipulation 10) (emphases added).  Alessa and Almonte each attested that:  (1) he had received and read the plea agreement; and (2) he understood and it accepted its terms.  (Plea Agreement re: Mohamed Alessa at 6; Plea Agreement re: Carlos E. Almonte at 6).

At the plea hearing, the Court informed Alessa and Almonte of, and ensured that each understood, the waiver provision.  (Transcript of Plea Hearing, 09:24 - 11:19; 25:03 - 26:16). The Court then found that the defendants' pleas were knowing and voluntary.  (*Id.* at 25:08-19).

10

The waiver provisions were triggered when defendants' received sentences of less than 30 years' imprisonment.  Further, enforcing the waiver provisions would not result in a miscarriage of justice because, as explained above, the motions are founded on grossly inaccurate factual assertions and otherwise do not present colorable claims of prosecutorial misconduct or judicial error.  Accordingly, the Court should enforce the waiver provisions and deny the defendants' motions for reconsideration.

<u>**CONCLUSION**</u>

For the foregoing reasons, the government respectfully requests that the Court deny the defendants' motion.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

s/ L. Judson Welle

s/ Andrew D. Kogan

By: L. JUDSON WELLE
ANDREW D. KOGAN
Assistant U.S. Attorneys

Date: May 16, 2013
Newark, New Jersey

# **ATTACHMENT**

1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF NEW JERSEY
2                     CRIMINAL ACTION   11-cr-133-DRD

3      UNITED STATES OF AMERICA,    : TRANSCRIPT OF PROCEEDINGS
                                    :
4                                   :   S E N T E N C E
                                    :
5                  -vs-             :     Pages 1 - 145
                                    :
6      MOHAMED ALESSA and CARLOS E.:
       ALMONTE,                     :
7                                   :
                     Defendants.    :
8      - - - - - - - - - - - - - - -

9                                         Newark, New Jersey
                                          April 15, 2013
10
       B E F O R E:   HONORABLE DICKINSON R. DEBEVOISE,
11                     SENIOR UNITED STATES DISTRICT JUDGE

12
       A P P E A R A N C E S:
13
           PAUL J. FISHMAN, ESQ., UNITED STATES ATTORNEY
14         BY:  L. JUDSON WELLE, ESQ.,
           ANDREW D. KOGAN, ESQ.
15         Attorney for the Government

16
           STANLEY L. COHEN, ESQ.
17         Attorney for the Defendant

18

19
       _____
20     Pursuant to Section 753 Title 28 United States Code, the
       following transcript is certified to be an accurate record as
21     taken stenographically in the above entitled proceedings.

22
                              S/Mollie Ann Giordano
23                            MOLLIE ANN GIORDANO
                              Certified Court Reporter
24                            (973-220-9465)

25

 1    time being productive.  I've learned patience and how to
 2    control my emotions, and how to stay away from problems.  I'm
 3    not the same Omar from three years ago.  If I get another
 4    chance at life, I would do things a lot differently, due to my
 5    maturity and mentality.  I'd like to start a family and move on
 6    with my life, fix the pain that I've caused to others.

 7         Whatever sentence is imposed on me from this Court,
 8    you don't have to worry about me coming back to a court in the
 9    future to get sentenced again.  Thank you for your time.

10         THE COURT:  Alright.  Thank you, Mr. Almonte.  And you
11    can be seated.

12         Now, would it make sense to have our lunch break now,
13    and then the Government, you can go through uninterrupted.  And
14    I would think I ought to be able to get the sentencing in at
15    the conclusion.  I'll need a little time to reflect on what's
16    been presented to me, and then I should hope that with the
17    Government's presentation, it might take me a few moments to
18    put it altogether and then we could have the sentencing.

19         MR. WELLE:  We agree, Your Honor.  We'll be ready to
20    go right after lunch.

21         THE COURT:  Alright.  Why don't we recess until
22    12:30 -- until 1:30, and we'll pick up then.  Good, thank you.

23         MR. WELLE:  Thank you, Judge.

24         (Lunch recess)

25         MR. WELLE:  Can you hear me okay, Your Honor?

 1            THE COURT:  Yes, I can ear you fine.

 2            MR. WELLE:  Your Honor, Mr. Kogan and I are going to

 3     try to keep our comments --

 4            THE COURT:  I would like to impose sentence this

 5     afternoon.

 6            MR. WELLE:  We hear you loud and clear on that.

 7            I want to speak very briefly about the preliminary

 8     matters, the legal parameters about sentencing members of the

 9     public may not know.  I do want to briefly talk about the

10     overview of sentencing.  I will then proceed to address the

11     arguments that are in common to the defendants.

12            Mr. Patton, I believe, mentioned that there was a

13     joint effort on the part of the defendants in defending the

14     case, and we think it will move things along if I address

15     certain of the 3553(a) factors that are in common before

16     handing it over to Mr. Kogan, who will address the more

17     particularized evidence, and the more particularized arguments

18     that you've heard here today.

19            THE COURT:  Good.

20            MR. WELLE:  Why don't I start with that.  We have a

21     guilty plea here.  The defendants have waived their right to a

22     jury trial and everything that goes along with it.  In fact,

23     they waived the right to indictment.  They pled guilty only

24     after a criminal complaint was filed.  And the Government

25     suggests they did so because they knew that the evidence of

```
 1    their guilt is overwhelming.  They gave up their right to have
 2    a jury of their peers hear evidence about not only the proof
 3    that they committed the crime, but also any proof that would
 4    support an affirmative defense, an affirmative defense such as
 5    duress.  An affirmative defense such as entrapment.  And we've
 6    heard a lot about entrapment, notwithstanding the fact that the
 7    defendants have pled guilty and the Government submits that by
 8    waiving their right to a jury trial, they essentially move
 9    forward fully, embracing the notion that they are in fact
10    guilty.
11          Now, the offense that they pled guilty to, Your Honor,
12    is a serious one, conspiring to murder someone outside the
13    United States.  It's a conspiracy to murder.  It's not a
14    conspiracy to provide support or vague notions of supporting a
15    terrorist organization.  Rather, the object was very clear,
16    they conspired here in the United States to travel abroad, and
17    once abroad, to kill disbelievers in Islam.  The disbelievers
18    of Islam.
19          Now, the timeframe of this conspiracy, Your Honor, was
20    addressed in the plea proceedings.  The timeframe was nearly a
21    three-and-a-half year conspiracy beginning in October of 2006,
22    and continuing until the date of the defendants' arrests on
23    June 5th, 2010.  Part of the plea, Your Honor, also included
24    the commission of overt acts, as Your Honor is aware.  Overt
25    acts included travel to Jordan in 2007, in furtherance of the
```

 1    defendants' murder conspiracy.  It involved various aspects of
 2    training, as you've heard.  These included physical training as
 3    well as combat training.  The overt acts that were admitted to
 4    by the defendants also include obtaining money, and also,
 5    importantly, agreeing to pool their resources in order to make
 6    a more effective conspiracy.

 7            The defendants also admitted that they acquired
 8    clothing, tactical clothing and equipment that they believed
 9    would prepare themselves for a mission abroad.  They also
10    admitted that in furtherance of their murder conspiracy, they
11    viewed and played for other extremists videos, audios, and
12    documents that were related to, produced by, and referred to al
13    Qaeda, other foreign terrorist organizations, and al Shabaab,
14    and Anwar al-Alwaki.  The defendants also admitted that their
15    attempt to board those two separate flights on June 10th, 2010,
16    were an attempt to join al Shabaab fighters on the battle
17    fields of Somalia.

18            Now, as part of the guilty plea, the defendants
19    acknowledged that they knew at the time of the conspiracy, and
20    they knew at the time that they got on -- tried to get on the
21    aircrafts, they knew al Shabaab was a violent foreign terrorist
22    organization.  The defendants also admitted the factual basis
23    of the so-called terrorism enhancement in the guidelines, which
24    is to say that they admitted their offense was calculated to
25    affect Government conduct through intimidation and coercion.

1     And they admitted their offense was calculated to retaliate

2     against Government conduct.

3             Now, we have a plea agreement here, Your Honor, and

4     it's important to quickly review the terms the Government

5     submits.  The maximum term of imprisonment that is authorized

6     under the statute the defendants pled guilty to is life

7     imprisonment, and they acknowledged that when they entered into

8     the plea agreement.  Of course, the plea agreement also

9     addresses what the applicable guidelines are in this case, and

10    both parties agreed that the applicable guidelines recommend a

11    sentence between 30 years and life.  They also agreed that the

12    enhancement I just discussed applied to their offense.  And

13    further in the plea agreement, the defendants and their counsel

14    agreed not to challenge that enhancement or the advisory range

15    that it produces.

16            Now, very, very, very importantly, the Government has

17    agreed in the plea agreement not to seek a day over 30 years

18    imprisonment for these defendants.  The Government stands by

19    that, and nothing I say, and nothing we've said should be

20    construed as an argument to the contrary.  The Government is

21    seeking no more than 30 years imprisonment.

22            Now, part of that is a concession, Your Honor.  The

23    Government did not have to make that concession, but we did so,

24    and we are seeking the low end of that applicable guideline

25    range.  And we suggest that Your Honor consider that as you

 1    consider all of the 3553(a) factors.

 2            Now, the plea agreement allows the defendants to ask

 3    for a sentence below 30 years, but they may not ask for one of

 4    less than 15.

 5            Now, Mr. Patton referred to one other term in the

 6    plea agreement, and that's the appellate waiver.  And the

 7    Government was not even going to address that, but there are --

 8    there is an appellate waiver that applies to both the

 9    Government and the defense.  And as to the Government, it says

10    if Your Honor were to impose a sentence between 15 and 30

11    years, the Government would not appeal.  Likewise, if a

12    sentence within 15 to 30 is imposed, the defendants would not

13    appeal.

14            Now, we don't really think that's relevant for Your

15    Honor to consider here.  Mr. Patton, though, made an argument

16    there.  He somehow suggests that the Government is conceding in

17    the plea agreement that a sentence below 30 years would be

18    appropriate.  We do not, Your Honor.  We strenuously argue for

19    a sentence of 30 years because of the reasons I'm going to

20    discuss here, and that Mr. Kogan is going to discuss further.

21    That sentence is sufficient but not greater than necessary to

22    promote the goals of sentencing.

23            But even if Your Honor though Mr. Patton's argument

24    about the appellate waiver somehow operates as a concession,

25    well then you'd have to admit that it operates the same way

 1    against the defense as well.  They too have agreed not to

 2    appeal if a sentence is imposed up to 30 years.  So what's good

 3    for one side is good for the other, is essentially my point

 4    there.

 5            Now, moving on to the sentencing process.  The

 6    Government is fully confident that Your Honor will follow the

 7    Third Circuit's instructions to calculate the guideline range

 8    in step 1 and in step 2.  You'll consider any downward

 9    departures motions.  In fact, none have been presented.  And,

10    in fact, the plea agreement precludes them.  And importantly,

11    in step 3, Your Honor will exercise discretion to consider each

12    and every one of the 3553(a) factors in determining what the

13    appropriate sentence should be.

14            Now, as I stated a moment ago, the goal of sentencing

15    is to impose a sentence that is sufficient but not greater than

16    necessary to comply with the goals of sentencing.  And that

17    this too works both ways, that a sentence cannot be more

18    stringent than necessary, but it also cannot be too lenient to

19    essentially sacrifice some of the important goals of

20    sentencing, which will be discussed here.  And for sentencing

21    purposes, as Your Honor well knows, involves a sentence that

22    reflects the seriousness of the offense, that promotes respect

23    to the law, that provides just punishment, that affords

24    adequate deterrence to criminal conduct to protect the public

25    from further crimes of the defendant, and to provide the

1    defendant with needed educational, vocational, medical care or

2    other correctional treatment in the most effective manner.

3          And before Your Honor looks to promote those goals,

4    the sentencing statute directs Your Honor to look at the nature

5    and circumstances of the offense, the history and

6    characteristics of the defendant, the kinds of sentences

7    available.  And we would say quite importantly here, Your

8    Honor, to consult the Guidelines, and the guideline range, as

9    well as the policy guidelines statements.  Moreover, Your Honor

10   should look to the need to avoid unwarranted sentencing

11   disparities among defendants who have been with similar

12   records, who have been found guilty of similar conduct.  That

13   concludes the preliminary overview.

14         Now, with regard to common factors Your Honor, these

15   defendants have committed a crime that goes straight to the

16   heart of those 3553 factors that relate to a serious offense,

17   and that implicit need here to protect the public.  And that's

18   because what we're dealing with is a conspiracy.  This is not

19   just a single person's actions, but rather it's a combination

20   of two people.  Two people, when they combine, serve and

21   present a greater risk that their criminal conduct will succeed

22   because they're able to pool their talents and pool their

23   resources.  More importantly, Your Honor, it's a conspiracy to

24   commit murder, one of the most serious crimes, if not the most

25   serious crime, without a doubt.  Not only to commit murder,

1   Your Honor, but to commit murder on behalf of a foreign

2   terrorist organization.  And moreover, to retaliate against

3   Government and to intimidate and coerce.  This is essentially,

4   just by the very nature of this offense, an absolutely

5   seriousness offense, and one that demands a serious sentence in

6   order to protect the public.

7          What I'd like to do now is talk a little bit about the

8   evidence.  I want to talk a little bit about the evidence that

9   shows that the defendants had a deeply held desire to kill the

10  disbelievers of Islam.  When I use the term "disbelievers", I'm

11  talking about the term and knowledge that they used, they

12  referred to disbelievers as Kuffar, Kufear.  This is an arabic

13  term that in various translations translates to infidels.  Here

14  I'm going to just use the shorthand "disbelievers".

15         Now, first, Your Honor, the recordings that were made

16  in this case from late November, 2009, through the date of the

17  defendants' arrest, provide an insight into what the defendants

18  believed and what they intended.  These recordings are

19  extraordinary evidence, Your Honor, that go to the 3553(a)

20  factors:  Seriousness, protecting the public.  That is because

21  in unguarded moments, the defendants revealed what it was that

22  they were most interested in pursuing, and they only revealed

23  them to an individual whom they believed was one of them.

24         Let's start by looking at the statement of Mohamed

25  Alessa about doing killing here in the United States.  Alessa:

1     "We're being pushed by every corner of the earth.  They only

2     fear you when you have silah - translation, gun - and you start

3     killing them; and when you take their head and you go like

4     this, and you behead it on camera.  Also, that everyone has to

5     be ruthless with these people.  We'll start doing kutel -

6     translation, killing - here, if I can't do it over there.  I'm

7     gonna get locked up in the airport, then you're gonna to die

8     here then.  Major Nidal Hasan, he's not better than me.  I'll

9     do twice what he did."  This is Mohamed Alessa on November 9,

10    2009.

11          Let's look at another statement, how he would love to

12    receive orders to do attack in the United States.  The next day

13    after the proceeding statement whenever they think I'm leaving,

14    they always think I'm gonna come back Yanni.  I leave this time

15    in Inshallah - translation, God willing - I never come back.

16    I'll never see this crap hole.  Only way I would come back here

17    is if I was in the land of Jihad and the Amir - translation,

18    leader - ordered me to come back here and do something here.  I

19    love that.  This is Mohamed Alessi talking about receiving

20    orders abroad to come back to the United States and do

21    something here, something he relishes.

22          Let's look at something in Mr. Almonte's statement on

23    May 13th, 2010?  "There's no such thing as innocense, Yanni.

24    The Shariah just judges combatants and non-combatants.  The

25    west, they elect their systems.  If they were really against

1    their president, they would go take him down and try to force

2    him to bring the troops back to this country.  If they failed

3    to do something like this, they are all responsible for it.

4    This is Mr. Almonte talking about how individual, ordinary

5    Americans are personally responsible for the acts of the

6    Government which Alessa and Almonte perceive to be at war with

7    Islam.

8              And as we'll see later, Your Honor, their rationale,

9    their rationale assigning personal responsibility for what is

10   believed to be an attack on religion is something that Almonte

11   shared with Anwar Alwacki.  And there is evidence in the

12   record, Your Honor, from the April, 2010 Alwacki videoed that

13   defendants watched in which Anwar Alwacki, is being asked about

14   the December 25th, 2009 attempted bombing of a Detroit bound

15   airliner by an individual named Umar Farouk Abdulmutallab.  In

16   that video of Mr. Alwacki that the defendants watched.  Mr.

17   Alwacki dismissed the notion there's a problem with killing

18   U.S. civilians.  He dismissed it because he believed that those

19   lives of U.S. civilians were forfeited because they elect the

20   president, who in turn sends the troops abroad.

21             I just want to move on, Your Honor.  Mr. Alessa talked

22   about a -- and described for the UC a scenario, in which he,

23   the UC and Mr. Almonte, would conduct fire fighting with

24   weapons in the streets of the United States.  And Your Honor

25   maybe familiar with this because it's in our briefs, but

1       essentially on December 7th, 2009, Alessa said this.  "You

2       know, if we did something here, we'd be the first time people,

3       because every other thing that happened here was just an

4       attack.  It was nothing like an all-out warfare.  UC:  Yeah,

5       yeah, Alessa firefighting in the streets.  UC:  Yeah.  Alessa:

6       The streets.  I'd like to be, uh, in the streets of --  UC:

7       What streets?  Alessa:  Untelligible.  UC says:  Yeah, yeah,

8       you know?  Alessa:  You know with the cameras, they see you,

9       everything.  It'll be like all over the news and we're gonna

10      be -- gonna get shehada - translation, martyrdom - in a few

11      hours.  They're going get us, Yanni, but imagine the ru'ab -

12      translation, terror.  UC:  They're going to fear everything.

13              The statements of the defendants show that they were

14      interested, motivated, and intending to kill disbelievers in

15      Islam, whether it be in the United States or abroad.

16              Here's a statement of defendant Almonte talking about

17      how he believes it would feel good to kill, quote unquote, a

18      faggot.  Mr. Almonte:  To kill a faggot, like it probably feels

19      very good.  To kill a faggot, it probably feels very good.

20      They are definitely not even worth a sword, though.  Throw them

21      off a cliff.  Mr. Almonte believes the best life he can imagine

22      is killing disbelievers.  On this date, December 7th, Mr.

23      Almonte tells the UC, and actually he asks the UC:  What's

24      holding you back?  What's holding you back to going abroad to

25      kill?  He essentially says this:  You don't need much, you just

1    need a ticket.  You just need some tactical clothing and a list

2    of what you think you need.  We know what we have to do, and

3    we're just gonna to it, Inshallah.  We need to get out of here.

4    We need to make hijrah, Yanni.  He continues and says that:

5    Once you have these necessary things, you go overseas and you

6    get to kill Kuffar, disbelievers.  And you take the ghanima and

7    then kill Kuffar.  And then the Amir - translation, leader -

8    gets them and distributes it amongst the ranks.  And he also

9    says that you get your weapons when you get there and that's

10   the best life.

11          Now, Your Honor, I want to just briefly point you to

12   the record here which shows the items that the defendant

13   brought with them, which absolutely show what they have already

14   admitted, that when they left the airport on June 5th, 2010,

15   they were on their way to a battlefield.  This is just a list

16   of the military style clothing, boots, and other gear defendant

17   Almonte had in his luggage.  And if I advance further one

18   slide, it's essentially the same gear, clothing, equipment that

19   Carlos Almonte had, and these are the same things that

20   defendant just listed out in the statement that we covered a

21   moment ago.

22          I would also note for the record, Your Honor, that

23   these same items, Your Honor also observed by law enforcement

24   when they served the defendants' luggage when they went

25   outbound on their 2007 trip to Jordan.

1              Your Honor, the defendants also talked about killing

2      other Muslims in the United States.  Mr. Alessa, in this

3      conversation on May the 12th, talked about killing any number

4      of groups of Muslims who did not share his ideology.  He talks

5      here about wanting to kill those that involves himself in the

6      affairs of Muslim.  He talks about wanting to kill the ICPC

7      people, which is a reference to the Islamic Center of Passaic

8      County in Patterson, New Jersey.  He talks about wanting to

9      kill the sufis.  He talks about wanting to kill the Ahmadis and

10     the Shia.  He says this is his belief.  He says:  I want to

11     kill the Kuffar.  This is his list of the people he wants to

12     see killed.  This includes other Muslims that do not share his

13     particular set of beliefs about his religion.  And I would note

14     for the record that Mr. Almonte was involved in that

15     conversation as well.

16             Now, we also see Mr. Alessa talk about how his beliefs

17     in his violent ideology are so strong that if one of his

18     friends or family members stood in his way, he would want to

19     kill them as well.  Mr. Alessa says on May the 17th:  I have no

20     problem killing any one of my family members or friends.  I

21     have no problem killing you, referring to the UC; or Omar,

22     referring to Almonte, if you would partake or do some active

23     Kuffar.  Translation:  Major sin.  They know that's gonna put

24     my life in danger, or anyone.  I told them if you ever

25     apostated, I'll be the first one to slice your throat with

1      pleasure.

2              Alessa and Almonte also discussed how they wanted to

3      see American troops killed.  Here's Almonte on June -- I'm

4      sorry, January 31st, 2010.  "We don't want to hurt this

5      country.  For what, Yanni, I was born here, you know, raised

6      here.  I just want the troops to come back home safely and

7      cozily."  Alessa:  "In body bags, in casekts".  AlMonte:  "In

8      caskets".  Alessa:  "Sliced up in a thousand pieces, cozy, in

9      Kabr, the grave in hell." Alessa also told the UC how he

10     believed that he the UC and Almonte were opposed to the United

11     States troops, whom they wished to kill.  It was a true us and

12     them scenario, and that was his view, and that was Almonte's

13     view, and it was shared with the UC on September the 7th, 2009.

14     Even Omar, when he made a very interesting point, Your Honor.

15     As we speak, ourakhut - translation, sister - that's in nikabi,

16     that guarded her chastity, her life.  That guarded her sharaf -

17     translation, dignity - and all honor for that one assad -

18     translation, lion.  The guy who is going to marry her.  That

19     one akh - translation, brother.  She's being raped multiple

20     times by pigs and by monkeys, blacks and whites.  Kafara -

21     translation, disbelievers - and Murtadeen - translation,

22     Apostates - and Omar started crying, Yanni.  And then he was

23     like:  What the hell are we doing in a balad - translation,

24     Country - that fights our deen - translation, religion - and

25     what are we doing here?  Look how easy it is to fight, to fight

1    our deen.  All you got to do is enlist in the army and they

2    slip you right over to Iraq.  Look how easy it is to go.  It's

3    easy for them to fight us, but it's hard for us to fight and

4    kill them.

5            This is the defendant Alessa talking about a

6    conversation that he had with Almonte about how they are

7    finding it very difficult to pursue the object of their

8    conspiracy.  It's hard for them to find ways to train, to gain

9    weapons, and he's contrasting with how easy it is to -- for

10   American troops to enlist, to be trained to be outfitted with

11   weapons.  All of these statements, Your Honor, served to show

12   that the defendants present a risk to the public, and that is

13   why they need a significant sentence here, and it also shows

14   the seriousness of the offense.

15           Your Honor, I just want to cover one or two more.  Mr.

16   Almonte on April the 25th was speaking to the UC, and Mr.

17   Almonte told the UC, Somal, referring to al Shabaab, took over

18   three towns more.  "Yeah, they took over three towns from the

19   Government.  I don't know if I even see boots from America

20   there Inshallah, God willing."  UC: Soon.  Almonte:  Inshallah.

21   UC:  Almonte laugh.  UC:  Oh, man, can you imagine?  Obviously

22   he's saying imagine the prospect of Americans being in Somalia.

23   Almonte:  Yeah, it's not much fun killing Africans.  Here's

24   Almonte relishing killing American soldiers when he's over in

25   Somalia.

1          Finally, Mr. Alessa said this. "Nah, I swear to God,

2    bro, I wanna like -- I'm not, my soul cannot rest until I shed

3    blood.  I wanna like be the world's known terrorist fi

4    al-alam" - translation, in the world - "I swear to God".

5          Your Honor, those are just some of the many statements

6    that this UC recorded of both Alessa an and Almonte in

7    unguarded conversations talking about their desire to see that

8    the object of this conspiracy is achieved.

9          Now, the statements aren't the only thing.  Mr. Cohen

10   said Mr. Almonte had a big mouth, and Mr. Patton said these

11   guys would talk to really anyone about it.  That's not the case

12   when you look at the record.  In conversation after

13   conversation, the defendants were concerned and were aware of

14   who was around them when they made statements such as this.

15   They weren't spouting off to anyone because they understood,

16   they understood that law enforcement had earlier in this case

17   overtly made it known to them that they were under

18   investigation.  It was no secret that law enforcement believed

19   and had gathered some evidence that Alessa and Almonte were

20   pursuing a Jihadist objective and they nonetheless made these

21   statements in unguarded moments to the UC.

22          And the other evidence that I want to talk about, Your

23   Honor, and I'm just going to talk about it.  We haven't set up

24   videos and we haven't brought up audio equipment here to talk

25   about some of the testimony.  I want to talk about these

1    Jihadist videos.  Mr. Patton made a lot of comments about it.

2    The Government wants to speak about them.  We believe they also

3    evidence the defendants' desire to kill.

4         First of all, the first category the defendants had

5    under this category are depictions of sniper attacks on U.S.

6    troops, of beheading, other executions of ambushes.

7         In this case, Your Honor, Mr. Patton stated that:  I

8    stated that Mr. Almonte was a collector of Jihadist propaganda.

9    And he characterized these videos as having been political in

10   nature.  Mr. Patton characterized these videos as being

11   political in nature and as having poetry.  And I just want to

12   refer to you the record, and in the Government's offense

13   summary in which we describe the graphic depictions of the

14   United States troop in Iraq and Afghanistan falling under

15   attack.  The reason it's being killed on camera, the ambushes

16   that are set up with them involve two teams, a team that's

17   going to conduct an attack and the team that's going to report

18   on video the attack for purposes of sending abroad, sending

19   other locations, to allies support their cause and by

20   callousness.  And in some of the videos that defendant Almonte

21   watched, we see the camera linger on the United States soldier

22   sitting in a fighting vehicle, and he is just sitting at his

23   post.  It looks like a typical day for this soldier.  And he's

24   scanning left to right, just looking, you know, exercising his

25   responsibility on that day.  And it's ominous because the

1    camera stays on him and he's completely unaware of what's about

2    to happen.  And then what you see is this.  You see cross hairs

3    superimposed on the video by someone who edited it later.  And

4    those cross hairs note, as he sits there, oblivious to what's

5    about to happen, you're witnessing the final seconds of this

6    U.S. soldier's life on the video that Carlos Almonte watched.

7    In a second scene what happens, there's a puff of smoke in the

8    center of the helmet of the soldier, clearly the round pierces

9    the helmet and goes into the helmet and he slumps over dead.

10   And that's one example of the many sniper videos that we're

11   talking about here.

12           This is the material that Mr. Patton suggests was

13   political in nature.  It was just inspirational.  And again,

14   and again, and given, when you see videos that depict numerous

15   incidents and it's chilling some of these sniper videos, you'll

16   see a platoon of U.S. soldiers going down a street in an urban

17   area, in a populated area, and what happens in Irag, you see

18   the cross hair go up by that clever person to let you know

19   what's about to happen, and what soldier is about to get taken

20   out by a terrorist sniper.  And when that first shot comes and

21   that soldier falls down, his comrades do exactly what you'd

22   expect them to do.  So they run to him, they pick him up,

23   they're aware of the danger, and yet they're dragging him,

24   trying to drag him to safety.

25           What happens next?  That cross hair comes and targets

1    the man who's dragging his fallen brother to safety.  What

2    then?  Another shot rings out and he falls to the ground.  And

3    again, and again, and again, and that's what's in these videos,

4    depicting death of United States soldiers.

5             Mohamed Alessa and Carlos Almonte delighted in these

6    depictions.  We point to March 9th, 2010.  We describe for you

7    a video and a conversation because when the UC was able to get

8    on the inside of this conspiracy, the defendants showed him

9    videos, made them for him, and he was able to record what their

10   reactions were when they saw these U.S. troops being killed.

11   And on March 9th, 2010, Alessa goes to the computer and starts

12   playing an al Qaeda, Jihad is a video, he plays a scene in

13   which the terrorist have planted a road-side bomb on a road in

14   Afghanistan, and they're up on a ridge line, and the vantage

15   point is looking down at a convoy of U.S. army soldiers in

16   their Humvees proceeding.  And the spokesman for al Qaeda is

17   going to say:  What's going to happen next?  There's an

18   explosion that's about to happen.  And when that explosion

19   hits, the video depicts a Humvie blowing apart.  And the clever

20   editors have superimposed the sickle, directing your attention

21   to what is seen when the vehicle explodes.  It's a body, a body

22   of an United States soldier, end over end, head over heals,

23   flying from the wreckage.  Mr. Alessa's reaction?  Laughter.

24   Laughter which is recorded on the UC's recorder.

25             Alessa then does something remarkable, he plays the

 1    scene back twice more to watch again and again that U.S. convoy

 2    getting attacked, that soldier being ejected from the vehicle,

 3    end over end.

 4            The defendants didn't just delight in watching U.S.

 5    soldiers and others being killed from a distance, they also

 6    delighted in the depictions that got really up close and

 7    personal, and I'm talking about execution videos here, Your

 8    Honor.  You may have heard them on the news.  You may have seen

 9    news clips over the past several years about how people are

10    kidnapped and are made to kneel with their arms bound behind

11    them while a series of masked men pronounce their sentence.

12    And they take a knife or a sword and they put the person down

13    on the ground and they start sawing at their neck.  And they

14    capture this on video.  They capture this on video, this

15    atrocity.  And they send it out on the Internet.  And they send

16    it out hoping that it's going to reach individuals like

17    defendant Alessa and defendant Almonte, who are going to see

18    it, who are going to delight in it, and who are going to act on

19    it, and that's what happened here.

20            Defendant Alessa had a video on his cell phone of four

21    men bound, doused with gasoline, and lit on fire in a Jihadist

22    execution.  A court authorized interception in this case

23    captured multiple beheading videos that Carlos Almonte watched.

24    Almonte said, this is on the UC recordings, "I like watching

25    disbelievers get slaughtered", his words, Your Honor.

1              This wasn't collecting political speech.  This wasn't
2    inspirational poetry.  It's fellow humans being killed, being
3    killed by individuals like the defendants who had a violent
4    extremist ideology that rendered the lives of anyone who stood
5    in their way, anyone who stood in the way of their ideological
6    objectives, their lives were forfeited and they were fit to be
7    slaughtered.  Almonte's words.  Alessa, he didn't just watch
8    these videos, he promoted them.  He created a website under a
9    fictitious name.  The name "salafi witta RPG".  Not everyone
10   may know RPG refers to rocket propelled grenade, which is a
11   weapon of choice for insurgents.

12             On his website he puts these videos of U.S. soldiers
13   coming under attack.  He promoted them under this assumed name.
14   Not only did this material reach the defendant and motivate him
15   to act in furtherance of this conspiracy, he wanted to promote
16   it even further.  In fact, one of the things that the defendant
17   said on one of the recordings, he wishes he could recruit
18   numerous individuals to promote with him and to go -- it's not
19   surprising that Mohamed Alessa converted Carlos Almonte and
20   then carried him away from a view of Islam that is peaceful.
21   Mohamed Alessa and Carlos Almonte, they pursued a violent
22   extremist version of this religion; a strange, tortured and
23   perverted view of what religion required them to do.  And it
24   was wrong, and it was completely inconsistent with human
25   rights.  And it's completely inconsistent with what others in

1    the community were teaching.  And it was inconsistent with the

2    kind of Islam that Yasir Qadhi would talk about, and

3    inconsistent with the view of Islam that Yasir Qadhi promotes

4    in his institute where he holds seminars around the country for

5    Muslims to come and hear moderate views on Islam.

6           The other materials that the defendants made glorified

7    attacks in the United States, attacks like the 9/11 attacks,

8    the Fort Hood shooting in November, 2009, perpetrated by Nidal

9    Hasan, and the 2009 attempted bombing of the flight on

10   Christmas day, Umar Farouk Abdulmutallab.  The searches in this

11   case revealed on defendants' computers, actual documents that

12   showed the justification for killing what they saw to be

13   disbelievers.  As early as their trip to Jordan, in 2007, a

14   consent search of the Almonte family computer revealed a

15   document, an extraordinary document entitled:  Ruling on

16   Killing Persons out of Iraq.  This is the material that agents

17   found when the defendants had gone over to Jordan.  A search of

18   Alessa's home in June, 2010, revealed a document "Path to the

19   Land of the Battle".  The author of this document talks about

20   how it doesn't matter what Jihadist battlefield you go to, it

21   just matters that you go and you participate.  You go and you

22   kill.  And that is very important, Your Honor.

23          Mr. Cohen made a whole big deal about how Mr. Alessa

24   was considering different places to go.  This tells you why.

25   The idealogical justification that he was motivated by didn't

 1    say you had to go to Iraq, or Palestine, it says "go to a

 2    Muslim land where these individuals believe they're under

 3    attack, pick up a weapon and start killing."

 4            And as I mentioned before, the April, 2010 Alwaki

 5    video, and you've seen in our brief and in the papers where

 6    Anwar al-Alwaki says that those Americans who came so close to

 7    losing their life on that aircraft coming into Detroit on

 8    Christmas day, their lives would have been but a drop in the

 9    ocean compared to what Alwaki and other like-minded terrorists

10    believed they were owed.  Their debt is outstanding.  And that

11    even if they fulfilled their debt with some two hundred

12    American lives, it wouldn't come close to balancing the scales

13    to what they believe they're owed.

14            Your Honor, the next thing I want to talk about under

15    seriousness of the offense and protecting the public, is that

16    the defendants controlled their conspiracy.  So much of the

17    papers and arguments shift blame or that the defendants were

18    somehow, you know, puppets in some grandiose plan to create a

19    conspiracy.  And the evidence shows that is not the case.  The

20    evidence shows that the defendants were self-trained.  That

21    before they ever met the UC, they were engaging in the combat

22    simulation on the paint ball facility in northwestern New

23    Jersey.  And Almonte himself said:  This is for preparation.

24    They engaged in the physical conditioning.  Alessa said what

25    that was for:  Bigger muscles means killing more Kuffar,

1    killing more disbelievers.  That's what he told Almonte and the

2    UC on the trips to the gym, hand-to-hand fighting.  UC captures

3    on the recording device Alessa instructing Almonte and the UC,

4    and a third individual with the initials MO, in how to conduct

5    disarming tactics and stabbing tactics.  What is his guide is a

6    computer hooked to the Internet, playing the very same videos I

7    talked about, videos that are put out to inspire, to educate,

8    and to train.  They use the Internet as a tool to prepare to

9    kill disbelievers in furtherance of this conspiracy.

10           Firearms, Mohamed Alessa bragged -- not bragged, he

11   spoke highly of his skills as a marksman.  He talked about how

12   he felt when he was overseas and held an AK-47, an AK-47, he

13   bragged and talked highly about his skills as a marksman in

14   connection with his trip to Las Vegas, where he goes to a gun

15   range, and where he shoots handguns multiple times.

16           Now, again, anyone can go to a gun range, there's

17   nothing wrong with that.  Fine.  But to go to a gun range in

18   the midst of a conspiracy to kill disbelievers in Islam, while

19   you're watching videos and reading documents that are saying

20   the way to pursue Jihad is to get experience with weapons,

21   that's what this is, Your Honor.  Alessa even took pictures of

22   the silhouette targets.  And when you look at the pattern and

23   the spread of the bullets hitting the targets that I guess Mr.

24   Alessa got to keep as a souvenir, you see he was not making any

25   idle brag about his skills.  He talks about how 17 of the 20

1    shots all lit in the target, and that's verified in the

2    pictures that he took.

3            He also studied their attributes.  And what I mean by

4    that, I mean that in preparation to go to a battlefield and to

5    use automatic weapons that soldiers use, and the battlefield

6    Alessa studied up on what they were, he studied up on the types

7    of ammunition.  He even had a reported conversation, he talks

8    about the attributes of the AK-47 round over the M-16 round.

9    The AK-47 being the ones he anticipated getting in Somalia.

10   And he talks about the AK-47 round like this.  "That shit is

11   going to put a hole -- that shit is going to put a hole this

12   big.  It's going to tear out your ligament.  It's going to rip

13   right through your cartilage of your muscle.  It's gonna

14   destroy the bone.  I love weapons.  I love studying them."

15   That's Mohamed Alessa on January 31st, 2010.

16           What else is worth talking about under training, Your

17   Honor?  Defense counsel talked about, you don't see this, and

18   you don't see that.  Well, the recordings tell you why you

19   don't see more extensive training because the defendants

20   exercised caution.  They didn't want to get caught.  They

21   didn't want to get caught like other people had gotten caught

22   in the past.  And I believe Mr. Kogan is going to talk a little

23   bit more about that.

24           The defendants were self-directed.  This was a

25   three-and-a-half-year conspiracy the defendants admitted to.

1    They formed this conspiracy in October of 2006, through 2007,
2    2008, 2009.  They were essentially -- they were in charge of
3    this conspiracy, not anyone in law enforcement.  This was
4    mentioned by Mr. Patton, and it is absolutely at the heart of
5    this case and it's significant, and why the Government is
6    seeking 30 years.

7            Leaderless Jihad, it is a concept that was espoused
8    and promoted by Anwar Alwaki in an audio lecture called
9    "Constant on the Path to Jihad".  And what that man says in
10   that recording is that you don't have to wait for superiors or
11   bosses or Imams, or anyone else, to give you the green light to
12   go conduct an operation, a Jihadist terrorist operation.
13   Rather, you should look to the fact that there are enemies out
14   there, and you should act on your own.

15           Your Honor, the materials -- I'm sorry, the defendants
16   directed themselves as well through other Internet sources
17   beyond what's been called Jihadist videos.  They looked at
18   other videos from respectable newspaper organizations before
19   foreign -- they discussed articles in the New York Times by
20   investigative reporters talking about Americans who had gone
21   abroad to join terrorist organizations.  Mr. Almonte even went
22   so far as to go to weapon sites that are devoted to helping the
23   public understand this threat, websites that collect documents
24   from cases just like this one, where people can go and they can
25   look at different defendants different cases brought by the

1        Government.  They can look at FBI 302 reports.  And they maybe

2        released in the context of this proceeding, during this

3        conspiracy.  And the run up to get on that flight on June 5th,

4        Carlos Almonte is on line looking at FBI 302 reports in foiled

5        terrorist plots.  Why is he doing that?  He's doing that so he

6        won't get caught, so that he won't repeat the mistakes of

7        others.  And as with everything else, we know these two are

8        best friends.  And if they pursued this three-and-a-half-year

9        period to murder together, whatever one was learning was

10       helping the conspiracy.  Whatever fighting tactics Alessa

11       picked up helped the conspiracy.  And whatever information

12       Almonte got through his research was helping the conspiracy as

13       well.

14              One of the things they looked at was videotapes

15       release, the prosecution that occurred right here in this

16       district that Judge Kugler presided over.  It involved a trial.

17       The lead charge was very similar to this, conspiracy to murder.

18       And the defendants were convicted at trial.  And in the course

19       of those proceedings, a video was released.  And it was

20       subsequently posted to the Internet, and it depicted the

21       defendants in that case doing target shooting, doing target

22       shooting at a facility in the outdoors.  And in that video they

23       are shooting at targets and calling out the Takbir, which is an

24       exclamation that is used in innocuous circumstances, but is

25       more famously used in situations in which terrorist acts are

1      loud, they're calling out this phrase, and that was in the
2      defendants' view one of the things that got the Fort Dix
3      defendants caught in the first place, is the fact that they
4      were going outdoors conducting training in a way that might
5      attract attention and suspicion.  And later on, when these
6      conversations happened about how else they might consider
7      preparing, Carlos Almonte, having seen these videos, says -- he
8      references the Fort Dix guys getting life sentences, and he
9      exercises his caution and discretion not to do that.

10            Your Honor, before I move on, I just want to also note
11     the defendants funded their own conspiracy.  Mr. Patton gave a
12     view of how these tickets were purchased that I have to say I
13     think is just inaccurate.  Carlos Almonte worked a job at a
14     computer store.  He scrimped and he scraped, and he was
15     disciplined, he had amassed several thousand dollars worth of
16     savings.  Excuse me.  He transferred that money, that if he
17     carried it in cash, it would end up getting seized by law
18     enforcement as they traveled to Somalia.  It's all over the
19     recordings.  And so he deposited his money into the UC's bank
20     account for safe keeping.

21            Now, the tickets about purchased for Almonte and the
22     UC By Almonte, he sat down at the computer at the UC's
23     apartment.  He researched the date, and he picked the date, and
24     he did that transaction on line.

25            Now, because the money was in the UC's account, Carlos

 1    Almonte's money was being transferred to the UC's account.

 2    They used the UC's.  And so they were very clear that each was

 3    paying for his own ticket.  So while the UC's car may have been

 4    used, the funds for Almonte's ticket came from Almonte, and

 5    likewise Alessa.  He secured his own ticket, whether these were

 6    family contributions.  What we do know is this.  The UC didn't

 7    buy a ticket for Alessa, didn't make him buy a ticket.  In

 8    fact, Alessa showed up at the airport with a ticket and $3,000.

 9          So here the defendants got their own money, they

10    pooled their own resources, and after spending the money on the

11    flights, the training, opportunities, paint ball equipment,

12    clothing, collectively between the two of them, they had

13    $12,000 in cash and bank deposits to fund their onward travel.

14          Your Honor, the evidence also shows that the defendant

15    had a sustained commitment.  They had made this prior attempt

16    to Jordan.  A lot has been said on this.  I know that Your

17    Honor understands that this trip was taken in furtherance of

18    this murder conspiracy, principally because the defendants

19    allocuted and admitted that it was.  In Jordan, 2007, they

20    traveled together.  They lived together.  They pursued Jihad

21    together.  They linked up with a veteran Jihadist referred to

22    as Abudebah.

23          Now, at several times in the presentation of the

24    defense they talk about the Government painting things, and the

25    Government making things up, or what the Government is

1    presented to Your Honor is the record, is the evidence, it's

2    what's in the record.  If there's paint ball activity, that the

3    defendant said is for Jihad, for the record, that's what we're

4    pointing you to.  If Mr. Almonte tells the psychiatrist in

5    Jordan he met up with a veteran Jihadist, the Government is

6    presenting that to you.

7            Now, Your Honor, what did Almonte say about this man?

8    He said that he met frequently with this man at his home, he

9    and Alessa did in April, 2007, and Alessa received teaching

10   about Jihad and tack fear.  Tack fear being the term for

11   ex-communication.  And in certain instances being used by

12   violent extremists to justify the killing of other Muslims,

13   that they make a decision on the spot to killing another Muslim

14   for being unfaithful to the religion or turning their back on

15   the religion.  And in Almonte's memoranda it also revealed that

16   Almonte and Alessa made inquiries about getting into Iraq and

17   Afghanistan from Abu Obaidah, according to Almonte, shared

18   essentially his Jihadist pedigree.  That he was in Afghanistan

19   training around 9/11.  And that when the U.S. aerial

20   bombardment started, he and other militants fled.  He was

21   captured, and he was put in Guantanamo Bay, subsequently

22   released, went back to Jordan.  And when he got back to Jordan,

23   according to Almonte, Abu Beta tried to get into Iraq in 2006.

24   He was caught doing that, and he was jailed and released after

25   a year.  This is the mentor.  This is the individual that the

1    defendants managed to hook up with, managed to find to mentor

2    them in Jordan.

3             And you know this isn't made up, Your Honor, because

4    it's coming from too many sources.  First, the defendants

5    admitted in their plea, Alessa talks about trying to go from

6    Jordan to Iraq on the recordings.  And it's in the Almonte

7    memos, as I mentioned, family members alerted law enforcement

8    to the fact that defendants were going to abroad to kill

9    persons.  This all should lead Your Honor to the conclusion

10   that in 2007, these two defendants tried to go abroad to kill

11   U.S. soldiers.  They tried to find a way to get there from

12   Jordan.

13            I want to respond to two quick points.  Mr. Cohen

14   suggests that because Mr. Alessa did not want to be driven to

15   the border of Iraq and Afghanistan by his uncle and dropped off

16   there, that it can not be the case that the defendants actually

17   wanted to go to Iraq.

18            Well, that's the same as being on an airplane with

19   someone and having a person refuse to jump out of the airplane

20   without a parachute.  That doesn't say that the person wouldn't

21   sky dive with the parachute, it's just that they don't want to

22   jump out without protection.  Of course, he didn't want to be

23   dropped off at the border while U.S. fighters were being

24   dropped in and the U.S. was locking down their border.

25            If you would pause for one minute, I think I have to

1      queue up this presentation again.  Thank you for your patience,

2      Your Honor.  One more moment, I'll find where I am on paper.

3      What else, Your Honor, what else shows that the defendants had

4      a sustained commitment?  Well, in Jordan, Mohamed Alessa

5      attracted the attention of law enforcement there, or as Mr.

6      Cohen said, security services.  And I'm not going to respond to

7      Mr. Cohen's aspersion cast on foreign law enforcement agencies

8      with regard to torture and other things.  But even if you

9      accept Alessa's presentation on that, at face value, what it

10     says is that the Jordanian investigators knew that Alessa

11     presented a problem, and they wanted to be rid of that problem,

12     and they reached out to Alessa's family, and that they engaged

13     with them, and they didn't undertake any precipitous action.

14             And so there's a parallel there, Judge, because that's

15     the same thing that happened in this case.  In the earliest

16     stages, law enforcement in this case was seeking to deal with a

17     problem of Alessa, the fact that Alessa was threatening people,

18     was invoking bombings, invoking terrorism, putting others in

19     fear, family members, Almontes family members, his family

20     members, people at his school.  So despite the fact that he and

21     Almonte were approached by officials in Jordan who were

22     essentially concerned that they were pursuing Jihad, they

23     continued with it anyway.

24             Now, Almonte was essentially given the strong

25     suggestion by the Jordanians that he should leave, and he did

1    very shortly thereafter.  Mr. Patton says that there's

2    speculation going on, about why he left.  There's no

3    speculation, Your Honor.  Mr. Almonte wrote you a letter in

4    which he says, in his memoranda as well as to Dr. Xenakis, "I

5    ran out of money.  The Jordanians came down on us.  My mother

6    was sick.  It was a combination of factors."  But he got out of

7    there.  He didn't have a path to Jihad because, as his

8    memoranda says, Abu Obaidah says the way was closed.  He

9    himself had tried to go but he could not.  That's why he didn't

10   get to Jihad then.

11          Same way with Alessa, he ultimately left Jordan, and

12   when they came back, that's when the law -- that's when federal

13   law enforcement essentially went overt in this case.

14          The FBI interviewed Alessa and Almonte about their

15   overseas activities.  Made it very clear that they had serious

16   questions that needed to be answered about their activities in

17   Jordan.  They didn't have complete insight into what had

18   happened in Jordan, but they were concerned, based on the

19   things that members of the public had told them, people who

20   knew the defendants best told them that these individuals had

21   gone abroad to try to go commit Jihad, and now they were back

22   in the United States.  This was a big problem.

23          They were served with grand jury subpoenas.

24   Remarkably one of the -- one of the FBI agents got on the phone

25   with Alessa's mother and explained the nature of the inquiry in

1   response to her questions.  This was emblematic about how law
2   enforcement acted in this case.  This wasn't scalp hunting,
3   this wasn't entrapping behavior, this was about dealing with a
4   situation that presented to any objective person indications of
5   risk to the public.  But they weren't going off half cocked.
6   They weren't hiding the ball from Alessa or his family about
7   why they were investigating, or what they were interested in,
8   or what questions he would face in the grand jury.  Basically,
9   they told him "we're going to ask you about Jihad.  Are you
10  committing Jihad?  Are you trying to commit Jihad?  Why are
11  people saying these things about you?"

12          And when the defendants in late 2007 came to the grand
13  jury room right across the street to answer questions like
14  that, but they didn't talk about Abu Obaidah, they didn't talk
15  about their interests in finding a way to Iraq or Afghanistan.
16  And so after that appearance they continued with the
17  conspiracy, nonetheless.  And that is really significant,
18  Judge.  Because if they weren't serious, or if they cared about
19  their freedom more than they cared about pursuing the object of
20  the conspiracy, it would have ended there.  These individuals
21  were put on a witness stand and asked in a federal
22  investigation, about terrorism and their activity.  For them to
23  leave that grand jury room and continue with the conspiracy, as
24  their plea allocution shows they did, it's remarkable, and it
25  shows how serious this crime is.  It shows that the defendants

 1    are not going to be deterred, and the public needs to be
 2    protected, and that did only happen by a significant sentence
 3    here.

 4         Now, Your Honor, I want to talk just briefly about
 5    some arguments the defense has raised in common to marginalize,
 6    to dismiss, to spin the seriousness of this offense.  As I
 7    mentioned before, the defendants waived their right to a jury
 8    trial, they waived the opportunity to persuade a jury that they
 9    were entrapped.  And had they done so, had they reached one
10    juror and convinced one juror that they were entrapped, they
11    would have -- they would have not been convicted as they were.

12         But they pled guilty because they knew they were
13    guilty, and they knew the evidence proves they're guilty, and
14    such defense would not have been viable because they were not
15    entrapped.  Despite suggestions that they've taken
16    responsibility for what they've done, and we heard a lot of
17    that, but frankly the arguments of counsel are trying to attack
18    the investigation, trying to shift blame, and trying to suggest
19    almost entrapment like is a phrase that I think would apply
20    here.  And so they talk about scalp hunting, and they talk
21    about how agents manipulated the defendants in seeking
22    headlines in this case.

23         If the agents had been intent on arresting as many
24    young men as they could have, other individuals involved in
25    this case would also be here, wouldn't they?  They'd be sitting

1    right there with a conspiracy to murder, because this training,

2    watching these videos, these incriminating conversations, they

3    happened with more than just a defendant.  They happened with a

4    young man named KR, a young man, MO.  But they're not here,

5    Your Honor.  They're not here in this courtroom sitting next to

6    the defendants.  It flies in the face of the defense suggestion

7    that what happened here was an indiscriminate effort,

8    regardless of the defendants, to lock up as many people as they

9    could.  It's over blown rhetoric, and Your Honor should dismiss

10   it as such.

11        When you look at the record, and we laid this out very

12   clearly for Your Honor in our moving papers.  We talked about

13   how the UC in this case did not meet either defendant before

14   March, 2009.  And in March, 2009, the UC was introduced to

15   Almonte by KR, the young man who hasn't been charged in this

16   case, but who participated in many of these activities.  And

17   so, again, it's not as if the agents in this case sent the UC

18   to go get Alessa and Almonte.  And also as we pointed out, the

19   UC in 2009, wasn't even aware of the FBI's investigation.  He

20   was not part of their investigative team.  That later changed

21   but at the time he met the defendants.  He wasn't sent there on

22   any orders by this federal investigation to target those

23   individuals.  It's just undermined by the record.

24        Mr. Patton was confused, I believe, and not really

25   certain of the facts when he said them, but he said that in the

1    first recorded meeting, the UC mentioned getting the defendants
2    to overseas.  It's just not true, it's just not accurate, and
3    we laid this all out in our sentencing memoranda, Your Honor.
4    There first meeting after Alessa had said he wanted to do twice
5    what Nidal Hasan did at Fort Hood, after he said his soul could
6    not rest till he shed blood, after he said he wanted to be the
7    world's most known terrorist.  The UC revealed himself to be
8    like-minded.  That is what the UC did in the first meeting that
9    was recorded in late November.  But it wasn't until January
10    that he said this.  On January 6th, 2010 Your Honor, I'm
11    reading from paying 39 of the Government's consolidated
12    sentencing memoranda, "Alessa stated all you need is the
13    connect."  Okay, Alessa telling the UC that what Almonte and
14    Almonte, all they're waiting for, all that they need is a
15    connect, because otherwise they're ready to go kill.  That is
16    as clear a statement as one could get that these defendants are
17    ready and willing and contemplating going abroad to kill.  And
18    they're essentially saying:  All we're looking for here is
19    someone who will give us safe passage; otherwise, we're ready.
20    That is when the UC, for the very first time, mentions the fact
21    that there is a way for him to get the individuals he knows
22    overseas to help him out, and it's right there on page 39.  He
23    says this.  "I could arrange one, I could arrange it, you know,
24    if you guys really want to go one day."  Almonte immediately
25    says "summertime", Inshallah, God willing.  The UC almost does

1    a double take.  He says:  Huh?  Almonte:  Summertime.  UC:

2    Yeah.  Almonte:  And if we wanted to go now, like a tough time

3    right now at the airports.  It's bad.  You saw how everyone's

4    stuck up and everything.  What he's referring to is a few days

5    earlier Abdulmatallab attempted to bomb the airliner.  So the

6    airport security ramped up security.  After the UC slightly

7    suggests there might be a way, Almonte says "summertime" and

8    "ready to go."  I don't have to go over the whole thing, Your

9    Honor, it's laid out in our brief.

10            Alessa and Almonte proceed to talk about early.

11   Alessa and Almonte talk about round trip tickets, one-way

12   tickets.  The UC is sitting back and recording this.  He's

13   suggesting there might be a way to get safe passage, after they

14   say "all we're waiting for is safe passage".

15            There is a lot said before who this UC was, an older

16   person.  I don't know where that came from.  The defendants

17   spent months with the UC, he's a young man just like them.

18   He's in his 20s.  In fact, a few days before they left for

19   Somalia, Alessa says:  You're just like me.  He says:  You're

20   just like me.  He's asking the UC:  What kind of guns do you

21   think we're going to get over there?  And the UC says:  I don't

22   know, I haven't done this before.  And Alessa says:  You're

23   just like me.  He wasn't some veteran Jihadist.  He wasn't some

24   older individual, Dr. Abudabbeh makes him out -- Dr. Abudabbeh

25   makes him out to be some mentor figure.  It's just not there --

1        it's just not there on the recording.

2                And as we've already gone over, the defense had

3        everything they needed well before they met the UC, and so the

4        UC wasn't a mentor.  He wasn't a role model.  But who was?  As

5        I mentioned, Abu Obaidah, he was a mentor.  Who else was?  How

6        about someone defendants refer to as Sheikh Anwar?  They use

7        that honorary term.  Who is Sheikh Anwar?  Anwar Alwaki, that's

8        who it is.  It's him who put out the audio recording about

9        leaderless Jihad.  And the defendants had on their cell phones

10       and they played it in the car on the their way to go lift

11       weights.  And at one point they made the portion where Alwaki

12       says it doesn't require a leader.  And Almonte, I believe it

13       was Almonte, who reaffirms that.  He says:  It doesn't depend

14       on the other guy.  A lot of so-called scholars say it depends

15       on a leader, but that's not what Sheikh Anwar is calling for.

16       And they certainly believe he was an important figure.

17               But here's the thing, Your Honor, many people have

18       heard these recordings and haven't gone on to commit crimes.

19       It's not the fact that these recordings exist that makes

20       someone do things, it has to do with the individual.  And

21       that's what you have to do here, the Government submits

22       respectfully, is not look at the fact that there's efforts

23       being made to create terrorists in the United States, but

24       rather look at individuals who, despite warnings, and

25       interventions, and obstacles, are so committed to that, that

1    they proceed with that murderous objective nonetheless.

2              Briefly, Your Honor, Nidal Hasan, a role model,

3    Alessa, plays for the UC a recording.  In there an al Qaeda

4    spokes man, who's an American, by the way, is speaking in

5    English to American audience about how Nidal Hasan's actions at

6    Fort Hood make him a trail blazer and a role model to be

7    followed.  And it's at that very point in the recording that

8    Alessa says to the UC:  You know what he's doing?  That is the

9    spokesman, he's calling for attacks here.  That is Alessa's

10   interpretation.  And how could it be otherwise?  Nidal Hasan is

11   a trail blazer.

12             THE COURT:  Mr. Welle, you're going terribly long to

13   prove what's already admitted.

14             MR. WELLE:  I'll move it along, Your Honor.

15             With regard to Somalia, another young man had traveled

16   there, another American.  The defendants knew who he was.  They

17   wanted to follow in his footsteps.  Alessa had a picture of him

18   on his phone.  His name was Omar Hammami.  They watched videos

19   showing his exploits in Somalia.

20             Your Honor, I want to just talk briefly about Yasir

21   Qadhi.  One of the defense's mitigation arguments is that

22   there's this profile that Mr. Qadhi endorses called Jihadi

23   Cool.  A number of problems with that.  First, there's nothing

24   to suggest that Mr. Qadhi is a social scientist.  There's no

25   training.  There's no credentials in social sciences.  He tries

1        to promote this profile and put Alessa into it, and somehow
2        conclude that all of his conduct should be either dismissed or
3        minimized because of this profile.

4               The problem is, as you will recall, there were not any
5        external sources cited in the record.  He had not written any
6        papers.  In fact, I think the only one thing he tries to point
7        to in support of this as being an actual verified phenomenon,
8        outside of his own anecdotal experience, is an MPR, you know,
9        four-minute radio report.  It's certainly not the stuff of
10       empirical research.  It's certainly not the kind of thing that
11       would justify Your Honor to dismiss lightly or find minimizing
12       all that's involved here.

13              Your Honor, Mr. Qadhi's, as Mr. Cohen admits, is not
14       even a Ph.D.  He's completed his requirements, but he's not a
15       Ph.D.  But it's unfortunate, in his report in 2009 in this
16       case, he says that he is.  I just want to note that for Your
17       Honor for whatever you think that's worth.  And despite the
18       fact that he's not a Ph.D, how about the fact that he never met
19       Alessa?  In the 24 months that these defendants were being
20       sentenced, had never met Alessa.  But he purports to put in him
21       in a profile that he's discerning of a more lenient sentence.
22       I can go on and go with Yasir Qadhi.  His bias is apparent as
23       well, Your Honor.  He criticizes law enforcement in the report,
24       itself.  He's just not an objective observer.

25              He talks about the report being based on anecdotal

1      evidence.   There's no statistical study done.   Moreover, the

2      information he got from Alessa was through correspondence with

3      counsel.   We know that Your Honor is familiar with it, but in

4      this report, Yasir Qadhi is making grand claims about who

5      Alessa is, about what this crime is, and its significance.   But

6      he only asked Alessa four questions, and he asked them in

7      writing.   And they were delivered by defense counsel.   And in

8      writing answers came back.   There's no opportunity for

9      follow-up.   And you know, Your Honor, in summary, we would say

10     that there's just not -- in all that's involved here, Your

11     Honor should give that report very little weight.

12              Your Honor, moving on to deterrence.   Just briefly

13     on -- briefly on general deterrence.   The sentence Your Honor

14     imposes today will send a message.   The question is, what will

15     that message be?   I just want to impress upon you, Your Honor,

16     that the Government submits that conspiracy to murder, any

17     conspiracy to murder, is serious, and that should get a serious

18     sentence.   We wouldn't want to send a message that, you know,

19     courts don't take that seriously.

20              More particularly, in this content of leaderless

21     Jihad, the defendants here, we think, are emblematic of this

22     concern that the Government has and the public should have

23     about home-grown, violent extremists, people like others who

24     have pursued Leaderless Jihad.

25              Now, I know that foreign terrorist organizations are

1          pivoting, I think they seem to be, at least they are trying to

2          promote individuals to act without connection, without orders,

3          without funding.  They're asking people to pull themselves up

4          by their boot straps and commit terrorist crimes right here in

5          the United States, just as the defendants did.  And in some

6          ways these individuals are small groups of people, like the

7          defendants, you know, they're decentralized.  They're harder to

8          figure out if the person is a threat, is not a threat.

9                  Your Honor, also with regard to deterrence, this area

10         of the country is especially vulnerable with regard to these

11         issues.  As you know, economic, cultural targets, and all these

12         things are all close to, you know, this courthouse, or a

13         proximity to New York, bridges, tunnels, the population

14         density.  All these things make this district particularly

15         vulnerable.  The reason we point it out, the message you send,

16         if you send a message, home-grown, violent extremism will be

17         met with serious consequences.  It will be less likely the

18         Government believes that people will engage in these crimes.

19                 Your Honor, this is just one of several instances of

20         individuals who have acted criminally in this district or in

21         ways touching this district in this area.  You know, there's

22         the landmarks, the plot with the Blind Sheikh that targeted the

23         Lincoln and Holland Tunnels.  The 9/11 terrorists flew out of

24         Newark Airport.  Fort Dix.  Najibullah Zazi, which is the case

25         involving a young man who got on an airplane in Newark Airport,

1    on June, 2008, flew to Pakistan, where two of them got training

2    from al Qaeda, and they came back the next year and attempted

3    to create explosives and to bomb the New York City subways, to

4    be thwarted by New York City subways -- to be thwarted by law

5    enforcement.  And to come back with plans to attack the U.S.

6    homeland is an exceptionally serious problem.

7            And in addition to Faisal Shahzad, he was a

8    Connecticut resident, the Times Square bomber.  He traveled

9    abroad, came back with explosives, explosives training and came

10   back with funding, and he attempted to bomb Times Square in

11   May, 2010.  That's the concern, that people will be committing

12   these conspiracies, pooling for resources, going abroad,

13   getting training, getting resources, and coming back to attack

14   the United States.

15           Your Honor, the 3553(a) factors also call upon you to

16   consider the Guidelines, themselves.  You're familiar with the

17   reasons for that, the Sentencing Commission obviously has

18   considered all the factors in meting out the particular

19   guidelines.

20           And then just -- Your Honor, in closing, before I turn

21   it over to Mr. Kogan to talk to some of the particulars to

22   impose the Government's requested sentence, we submit would not

23   create an unwarranted sentencing disparity.  Your Honor, we

24   said in our papers that it's very difficult to compare cases,

25   one to another, to another, because there's any number of

1    factors that can distinguish them.  We pointed out a number of

2    examples.  Mr. Cohen has submitted his survey of cases.  If

3    Your Honor is inclined to look outside of the cases, to look at

4    other cases to see where they would Sheikh out, we would ask

5    you to look no further than this district, to look at the Fort

6    Dix cases.  And in the Fort Dix case, the defendants there,

7    five men who conspired to murder based on the same idealogical

8    motivation as these defendants who engaged in very similar

9    acts.  And admittedly there was a trial, and admittedly and

10   appropriately their sentence was higher than the ones that

11   should be imposed here.  But these defendants have pled guilty,

12   and of course they have a plea agreement.  And they enjoy the

13   right of that bargain where the Government is not asking for

14   anything more than 30 years.  But it's a reference point.  The

15   life sentences imposed on four of those defendants for a

16   similar conspiracy, those suggest strongly that a 30-year

17   sentence here would not create a disparity.  And moreover, Your

18   Honor, the fact that what the Government is proposing, that is

19   a low end guideline sentence, itself, strongly suggests to Your

20   Honor that there would not be a disparity created.  We're

21   within the Guidelines.  And, in fact, we're at the low end of

22   the Guidelines.

23          At this point, Your Honor, I'd like to ask Mr. Kogan

24   to come up and talk to you a little bit about the individual

25   characteristics of the defendants.

    1              THE COURT:  That would be fine, Mr. Welle.

    2              MR. PATTON:  Can I run to the rest room?

    3              THE COURT:  You want a recess?

    4              (Recess)

    5              THE COURT:  Alright.  I think we have everybody we

    6    need.

    7              Yes, Mr. Kogan, go ahead.

    8              MR. KOGAN:  Thank you, Judge.  Your Honor, as Mr.

    9    Welle indicated, I talk to you about something more, particular

   10    characteristics of the defendants.

   11              THE COURT:  Alright.

   12              MR. KOGAN:  The first thing I'd like to talk to you

   13    about is defendant Mohamed Alessa's lack of acceptance of

   14    responsibility.  This goes to both step 1, finding the

   15    Guidelines, and step 3 of your analysis today.  I start Your

   16    Honor off with something that defendant told Qadhi, one of the

   17    experts defense has in this case.  "I never wanted to kill

   18    anyone".  That's a direct quote from the defendant.  Your

   19    Honor, that flies in the face of the conspiracy to which he

   20    plead guilty.  You cannot resolve the two comments together.

   21    The conspiracy was a conspiracy to commit murder.  Mr. Alessa's

   22    comments were, he did not want to kill anybody.  Under a

   23    stipulation, the defendant has to continue to accept

   24    responsibility through today, through the time of his

   25    sentencing.  He has not done so, based off that comment, and

1    based off other things.  You've heard some today, but it's more

2    in his submissions.

3          The defendant would like Your Honor to believe that

4    the trip to Jordan was not part of the conspiracy.  I'm not

5    going to quote from the defense counsel's submission about his

6    comparison of the cat eating the tuna, but defense counsels and

7    the defendants, Your Honor, submit to Your Honor their trip is

8    not part of the conspiracy.  That simply is not true.  The

9    defendant pled before Your Honor and told Your Honor that in

10   furtherance of the conspiracy, he traveled to Jordan in 2007.

11         What else do we know, Your Honor?  We know that

12   defense counsel for Mr. Alessa, and Mr. Alessa has attacked

13   some of the other overt acts.  Single person shooter is done by

14   everybody.  Paint balling is innocuous.  The clothing they

15   bought he's been wearing since he's twelve.  Your Honor, they

16   are trying to have their cake and eat it too.  They came before

17   Your Honor, Mr. Alessa did, and he told Your Honor, "I

18   conspired to kill people.  And in furtherance of that

19   conspiracy, I trained, and I purchased clothing and hydration

20   systems."  He should not be allowed now to come before Your

21   Honor and say, you have to view it in context, everybody does

22   it, it's no big deal.  It is a big deal because he told you it

23   was a big deal when he said that was part of his conspiracy

24   with Mr. Almonte to travel overseas and kill people.  He should

25   not be allowed to walk away from his acceptance at this time.

1          THE COURT:  Alright.  Go ahead, excuse me.

2          MR. KOGAN:  Thank you, Judge.

3          Furthermore, Your Honor, the defendant relies on

4     experts.  And I'll talk about them more in a minute, who denies

5     his culpability, who caused a fantasy.  You heard defense

6     counsel talk today, about maybe he would have never done

7     anything.  Once again, Your Honor, the Government is going to

8     let the defendant and his counsel talk about what could have,

9     maybe should have been.  The Government is going to bring you

10    back to the facts, bring you back to the evidence.  The

11    conversations, the recordings, the videos, and the defendant's

12    plea to Your Honor that he was in this conspiracy.  He is no

13    longer accepting responsibility for that, planned and bald

14    statements otherwise.

15         He also does not accept responsibility by attacking

16    law enforcement.  To quote but a few, there's a case building

17    agenda.  You've heard scalp hunting time and time again today.

18    You've seen by submissions, enticed, possibly exploitive

19    actions, Your Honor.  Those are largely in reference to the

20    person being spoken about today, the Bassem, the UC who the

21    defendants met in 2009.  But the defendants told you when he

22    pled guilty before you, this conspiracy started in 2006.  To

23    lay any blame, blame soliciting allegation that this was a

24    scalp hunting enticement exploitive, is denying his acceptance

25    of responsibility.  Defense counsel tried to walk that fine

1    line and tell Your Honor he does accept, you have to look at

2    things.  No, that's not accepting, Judge, and shouldn't be

3    allowed to stand.

4         And in addition to his outright, Your Honor, lack of

5    acceptance, defendant also tries to shift blame for his action.

6    "It's not my fault.  Yeah, I did it but here's why.  I'm

7    sympathetic, I deserve Your Honor's leniency, a significant

8    variance to the low end".  He blames almost everybody, Your

9    Honor.  He blames America's lack of cultural sensitivity.  He

10   blames his parents for being indulgent and loving him.  He

11   blames local Imams for not sending him down the right road.  He

12   even says at one point, Your Honor, in his papers, that he is

13   sympathetic, and he deserves leniency because, AH, his domestic

14   partner or wife, I'm not sure how you should refer to it, AH

15   left him and ended their marriage.  And that was part of the

16   perfect storm that defense counsel's talks about.

17        Well, Your Honor, defense counsel talked today about

18   AH leaving him, he just left one thing out in talking about

19   that, the reason she left him.

20        THE COURT:  He was going around with other women.

21        MR. KOGAN:  That, Your Honor, and he chocked her --

22        THE COURT:  Not following the Muslim rule.

23        MR. KOGAN:  In defense counsel's own papers, Mr.

24   Alessa struck that lady and he choked her, and that's why she

25   left.  But somehow that plays to the defense benefits that he

1    could choke someone.  He also blames over consumption of
2    caffeine liquids and supplements.  The schools that he went to.
3    The fact that he got kicked out and withdrawn from many
4    schools.  What he fails to tell you at one of the schools he
5    threatened to blow up the school.  It is the defendant's action
6    that lead us here today.  It's not beverages, supplements,
7    schools not doing right by him.  It is the defendant, Your
8    Honor.

9            Your Honor, there's only one thing that the defendant
10   truly does not blame, that's the person sitting two seats down
11   from him, Mr. Almonte.  At no point does Mr. Alessa, anywhere,
12   say anything negative about Mr. Almonte.  That's because they
13   were the two people who entered into the conspiracy.  The best
14   friend, I believe you heard Mr. Almonte say today.  The two
15   people who entered into this conspiracy over more than three
16   and a half years, to travel overseas, and at the end of the
17   day, go to Somalia, join a foreign terrorist organization that
18   has committed, and continues to commit, murder and kill while
19   there.  That's where the blame should be assigned, Your Honor.
20   The defendant and his actions, and his conspiracy.

21           Your Honor, I'd like to talk to you about the mental
22   condition of Mr. Alessa a little.  We've heard a lot about that
23   from defense counsel.  I'm going to talk to you about that same
24   thing for Mr. Almonte, and things first that they had in
25   common.  Both of them, Judge, knowingly and voluntarily pled

1    guilty before Your Honor.  They're here, and they're in this
2    courtroom.  They came before Your Honor, they appear guilty,
3    they came before Your Honor and answered your Honors questions.
4    Both of them told the probation officers who are here today
5    that they are in fine mental health.  Both of them Your Honor,
6    as seen through the evidence, were deliberate, were thoughtful
7    and were goal-oriented, with that goal once again being to
8    travel overseas and commit murder.

9           And how do we know that, Your Honor?  They excluded
10   people from their conspiracy.  As Mr. Welle spoke about, KR
11   introduced the UC, Bassem, to the defendants.  And you hear
12   later in conversation, Mr. Alessa and Mr. Almonte tell the UC
13   not to talk to KR cause he can't be trusted, because they don't
14   trust him.  So you, the UC, better not tell him about our
15   conspiracy.  They know who to include.  They knew that they
16   were serious.  They knew what they wanted to do, and they
17   didn't want to be stopped.  When they got concerned about other
18   people, they kept them out.  They fabricated cover stories.
19   They had a conversation where they talked about what they would
20   say if they were stopped by law enforcement, and what they
21   would say to others, post arrest.  Mr. Almonte's family was
22   surprised in part because he had told them he was going to
23   North Carolina, when instead he was gone flying to Egypt with
24   the intent to go to Somalia, join al Shabaab, and kill.  They
25   also booked round trip tickets.  And that may sound like

1    nothing.  Defense counsel tries to treat it as nothing, but Mr.

2    Almonte, told also the UC why that was important, because it

3    would look worse, and it might draw law enforcements attention

4    if they just booked an one-way ticket, even though it was going

5    to cost more.  And the records show Mr. Almonte was very

6    concerned with spending money, even though it would cost more,

7    Mr. Almonte dictated that round trip tickets be bought because

8    he was goal-oriented, thoughtful and deliberate.  And they also

9    sought to avoid detection, just one example, and this is

10   repeated conversations.  They take batteries out of their

11   phones and leave their phones out of the room because they are

12   worried there they are being surveilled by law enforcement, and

13   they want to make sure in these private conversations, they

14   argue and talk about their criminal activity, they're not

15   surveilled or overheard.

16          Concerning Mr. Alessa, Your Honor, another fact of his

17   mental condition is that he is a skilled liar and manipulator

18   later.  He spoke proudly of that in one of the conversations

19   with Almonte and the UC, when they talked about their cover

20   stories, how one of his expertise was being able to lie and

21   manipulate people, just like he lied to law enforcement when he

22   came back in 2007, and lied in the grand jury and 2007.  In

23   fact, Your Honor, the experts agreed that he's a liar and a

24   manipulator.  Dr. Drob, the only defense expert who made the

25   decision, who took the time to meet with defendant Alessa, said

1    that Mr. Alessa showed a pronounced tendency to avoid self

2    disclosure, and that Mr. Alessa may be manipulative in his

3    relationships.  Dr. Katz, one of the Government's experts, Your

4    Honor, Mr. Alessa repeatedly attempted to control the

5    interview.  Mr. Alessa would remain vague and ambiguous when

6    discussing information that showed culpability, or did not

7    present him in a positive light.  Dr. Patterson, a forensic

8    psychiatrist, one of the leaders in the field that said that

9    Mr. Alessa has demonstrated being extremely manipulative.

10             While we're talking about the experts concerning Mr.

11   Alessa, Dr. Patterson and Dr. Katz do make a diagnosis,

12   anti-social personality disorder, which is a persuasive pattern

13   of disregard for and violation of the rights of others that

14   begins in childhood.  So that explains why their reports have

15   many instances from their childhood from Mr Alessa and Mr.

16   Almonte, or early adolescence, and continues into adulthood.

17   That diagnosis, Your Honor, the Government submits to

18   consistent with the defendant's guilty plea, and consistent

19   with the evidence.  And they also find that Mr. Alessa

20   continues to be a risk of violence.  And, Your Honor, defense

21   counsel said that Dr. Katz and Dr. Patterson rely on the July

22   25th, 2012 incident at MDC, which the Government understands

23   your comments on, is not speaking further on it in light of

24   that.  There's only one problem with that, Your Honor,

25   defendant's wrong.  Dr. Katz signed his report for Mr. Alessa

1    June 22nd, 2012.  That's his only report in this case.  There's

2    no way he could rely on an incident that didn't happen yet,

3    even if the defense counsel says he did.

4              As Your Honor is well aware, there are also defense

5    counsel experts in this case.  They did not make a diagnosis

6    unlike Dr. Patterson and Dr. Katz.  Dr. Abudabbeh, most

7    important thing, Your Honor, if I can leave you with one thing

8    about that doctor, she never met with the defendant.  She did

9    not administer tests.  Instead, it appears she relied on

10   documentation submitted to her by defense counsel.  And what

11   she did was she then spoke about her theory, her theory that it

12   would appear any first generation Palestinian, Muslim, should

13   be excused for conspiring to kill people, or show leniency for

14   conspiring to kill people over three and a half years because

15   of his cultural history.

16             Your Honor, defense counsel talked about the

17   Government painting in its presentation.  The Government

18   submits to Your Honor, Dr. Abudabbeh is painting in a very

19   broad stroke which does not apply to the defendant, that would

20   have become clear to her, if she ever would have met him.  Dr.

21   Drob, the other defense expert for Mohamed Alessa, once again,

22   no diagnosis as to Alessa's present mental condition.  Like Dr.

23   Abudabbeh, he concludes that the defendant was in a fantasy,

24   tries to diminish his culpability, counter to what the

25   defendant himself told you during his plea, that he knowingly

1    and intentionally entered into a conspiracy to kill.

2         Your Honor, concerning Carlos Almonte and his mental

3    condition, much like Mr. Alessa, deliberate, thoughtful,

4    goal-oriented.  He saved thousands of dollars in furtherance of

5    this conspiracy to commit murder overseas.  He had a job, he

6    had a skill in computers, and he used it for one purpose, Your

7    Honor, to fulfill his desire to kill.  That's where his money

8    went.

9         And often defense counsel spoke about paint balling,

10   or going out and spending other funds.  Mr. Almonte often said

11   they shouldn't spend the money on it because the money was for

12   their conspiracy.  Mr. Almonte was also law enforcement

13   conscious.  He deleted -- I'm sorry, he made Alessa delete

14   Jihadist videos prior to their travel to Jordan in 2007.  And

15   he counseled Alessa from how to prevent law enforcement from

16   recovering information from his hard drive.  As I told Your

17   Honor, he recommended buying round trip tickets.  And in

18   addition, he researched.  He collected information about other

19   cases, and other Jihadist, and FTOs, and he did this to help

20   him and his co-defendant succeed in their plan to kill.

21        For instance, he learned about the Fort Dix case.  And

22   why was this important, Your Honor?  Because when the UC and he

23   talked about the idea of going paint balling, defendant Almonte

24   says no, and specifically references the Fort Dix case.  And

25   part of the reason the Fort Dix defendants, in his opinion, got

1    caught, because there was a video of them training that was

2    discovered by law enforcement.  So Almonte, based on his

3    collection of material, says no.  He also collected material

4    about al Shabaab, the group they intended to go join.  And he

5    even lectured Alessa and the UC about al Shabaab was a main

6    group in Somalia.  He was goal-oriented.  He was thoughtful.

7    He, like his co-defendant, knew what they were doing.

8            Once again, Your Honor, concerning the experts, Dr.

9    Patterson and Dr. Katz, same diagnoses, antisocial personality

10   disorder, continued risk of violence.

11           The defense experts, Dr. Rosenfeld, in perhaps one of

12   the more clear statements by defense counsel experts given the

13   limited nature of the present evaluation, no definitive

14   diagnoses can be offered.  Dr. Xenakis, Mr. Almonte does not

15   currently manifest a definite psychiatric, medical or emotional

16   condition.

17           Your Honor, moving on from mental condition, I have a

18   few more areas to talk to you about.  One of the them is the

19   violent nature of the defendants.  Mr. Almonte, this is stated

20   in our briefs, I'm only going to hit a couple of highlights for

21   it.  He joined a street gang.  He carried a knife to use

22   against others.  He punched a 16-year old in the face.  He

23   threatened a family member with violence if that family member

24   told law enforcement about him and his co-defendant's

25   activities.  And he attacked his younger brother and smashed a

1    glass frame picture over his head.

2          Concerning Mr. Alessa, he -- there is evidence that he

3    punched his father.  As I told Your Honor, he threatened to

4    blow up a school.  He also threatened students at a school.

5    And as I referenced to Your Honor earlier, he struck and choked

6    AH, who left him as a result.

7          Your Honor, prior to finishing up, what I'd like to do

8    is paint a picture for Your Honor of the morning of June 5th,

9    2010, the morning the defendants chose to go to JFK Airport in

10   furtherance of their conspiracy to kill overseas.  The day they

11   chose to try to join al Shabaab and kill.  On that day, Mohamed

12   Alessa was living at home with his parents, who loved and

13   financially supported him.  He was living at home with a family

14   who was funding his education.  Who begged him to go to school.

15   And was living at home with his family who paid for his travel

16   in 2007, and paid for his travel, the Government believes, in

17   2010, because the defendant lied to them and didn't tell them

18   that he was going to kill.  That's what he did.

19         Mr. Almonte, he lived at home as well, with a

20   hard-working, loving, extended, supportive family.  He had a

21   job that paid him, and paid him pretty well, at least enough to

22   save up to help his conspiracy to kill.  He also possessed a

23   technical skill in computers.

24         Your Honor, the Government submits to you they had

25   what many people in this country and in this world would pray

1    for, a solid family base, three squares a day, and more than

2    that.  But that is not what the defendants wanted, Your Honor.

3    The defendants wanted to do what they watched and what they

4    did.  Mr. Alessa, Your Honor, wanted to go overseas, join al

5    Shabaab, kill on their behalf, like that video that Mr. Welle

6    spoke to you about, the IED, attacked the vehicle, and a body

7    going flying.  In fact, Mr. Alessa was so interested in this

8    type of situation that he made a video, Your Honor.  He made an

9    interrogation video.  In this video, he and I believe another,

10   dressed up a boxing mannequin, the upper torso of a body, to

11   look like a hostage, a U.S. soldier hostage.  Mr. Alessa,

12   masked, handkerchief over his face, then questioned that

13   hostage.  He questioned why he was there.  He accused him of

14   atrocities.  And then he repeatedly, repeatedly, repeatedly

15   stabbed that mock hostage.

16           Your Honor, Mr. Alessa had a family who was loving and

17   supportive, and that wasn't what he wanted, he wanted to go

18   overseas, he wanted to kill.

19           Mr. Almonte, what did he want?  Once again, you've

20   heard Mr. Welle speak about what Mr. Almonte viewed.  The

21   sniper video, hauntingly, with the cross hairs on a soldier,

22   and in the last moments of their life.  The beheading videos

23   where people are crudely, crudely killed.  The defendant had,

24   the morning of June 5th, a life at home, a job, and financial

25   support.  What they wanted, Your Honor, was to fulfill their

 1    conspiracy from October of 2006, to when they left, or I should
 2    say, tried to leave, Your Honor, to kill.

 3          And in conclusion, Your Honor, the Government would
 4    leave you with this.  You heard from the defense first today.
 5    Their arguments, Your Honor, do not support a variance, much
 6    less the significance variance they seek from the low end of
 7    the Guideline range to which they stipulated.  Instead, as I
 8    explained to you, and Mr. Welle explained to you, the
 9    defendants' actions, including their nearly four-year
10    conspiracy, including their trip to Jordan, including the overt
11    acts they took in furtherance of the conspiracy, and including
12    their attempt to leave this country on June 5th, 2010, to kill,
13    and the factors of 3553(a), and the seriousness of the crime,
14    the need to protect the public, and the need for deterrence,
15    Your Honor, warrant the sentence the Government is seeking,
16    specifically 30 years imprisonment for each defendant.  Thank
17    you, Judge.

18          THE COURT:  Alright.  Thank you, very much.  We'll
19    take a short recess and then I'll impose sentence.

20          (Recess)

21          THE COURT:  Alright.  I'll start with Mr. Alessa, and
22    you could just remain seated.  It will be a reasonably lengthy
23    process.  I just note from the beginning that I've reviewed the
24    extensive memoranda and exhibits which counsel have submitted,
25    read the reports of the United States, of the defense experts.

1    18 letters I've received from Mr. Almonte's friends, relatives,

2    who portrayed a picture of what Mr. Almonte will achieve in the

3    future.  Obviously, he hasn't during the course of the events.

4    And I've heard the arguments of counsel.  The statement of

5    reasons will be, the Court adopts the presentence investigation

6    report with the following changes.  There are additional

7    comments concerning certain factual information in the report

8    which I will modify.  Because this report will go on to the

9    Bureau of Prisons, that may be relied upon.  And the

10   modifications, although Alessa does not dispute the Guideline

11   calculation, he has submitted objections to the presentence

12   investigation report consisting of 18-and-a-half, single-spaced

13   pages.  It is, in effect, rewriting the presentence

14   investigation report to reflect assorted facts that support the

15   arguments set forth in Alessa's brief in support of a variance.

16          There are two factual contentions in the PSIR that

17   require comment.  Paragraph 133A of the PSIR, recites that

18   Alessa and Almonte, while in presentence detention, assaulted

19   another inmate in and outside the cell area.  PSIR refers to

20   the incidents as a possible ground for depriving both

21   defendants in the reduction and acceptance of responsibility.

22   And the Government points to the incident as indicative of the

23   defendants indicative violent nature.  The alleged victim was a

24   planter to make extortionate demands from their commissary

25   items, and threatened to use force on his demands.  It was

1    defendants' justifiable resistance that resulted in the episode

2    that was the subject of paragraph 133A.  It is not a basis to

3    challenge defendants' acceptance of responsibility or to

4    establish continuing violent tendencies.

5         The 2007 trip to Jordan is the subject of various

6    paragraphs of the PSIR.  Each defendant stipulated on the

7    occasion that, in his pleas, the trip was in furtherance of the

8    conspiracy, which the Court accept as corrects.

9    Less the objections, much of the material set forth in Alessa's

10   objections is irrelevant.  Much of the recital of the argument

11   set forth in Alessa's sentencing memorandum, they are dealt

12   with in the Courts statement of reasons.

13        Second, no count of conviction carries a mandatory

14   minimum sentence.  The Court determines that the advisory

15   Guideline range is as follows.  Total offense level, 42;

16   criminal history category, 6; imprisonment range, 360 months to

17   life; supervised release, life; fine range, $25,000 to

18   $250,000.  Fourth, the fine is waived because of the defendants

19   inability to pay.  The sentence imposed is below the advisory

20   guideline range.

21        On the defense motion for a sentence outside of the

22   advisory guideline system, to which the Government objected,

23   and the reasons for this is the nature and circumstances of the

24   offense, the history and characteristics of the defendant.

25   Pursuant to U.S. Sentencing Guidelines Section 3553(a), to

1    reflect the seriousness of the offense, to afford adequate

2    deterrence to criminal conduct; to protect the public from

3    further crimes of the defendant; to provide the defendant with

4    needed educational, or vocational, medical care or treatment in

5    the most effective manner.  I'm going to give to counsel and to

6    the public an extended statement of reasons, but I'll summarize

7    those reasons at this point.

8              The Court has prepared a detailed statement of reasons

9    why it is granting a variance to Mohamed Alessa and Carlos

10   Almonte.  The statement will be placed on the record during the

11   imposition of sentence.  Mr. Alessa can be summarized as

12   follows.  Alessa pled guilty to the most serious of crimes,

13   terrorism in the form of conspiracy to commit murder for

14   religious reasons of individuals outside the United States.

15   The lowest guideline prison term is 360 months, and preeminent

16   considerations are to ensure that Alessa no longer possess a

17   danger to the community, and deterrence of others who might

18   engage in a similar conspiracy.

19             The evidence shows that Alessa suffers from serious

20   psychological impairment from early childhood resulting from

21   continual hostile anti-social behavior.  And in later years, it

22   took the form of adoption of extreme Muslim religion, Jihadism,

23   which called for the death of those individuals who disagreed

24   with him, whether a Muslim or non-Muslim.  Alessa saturated the

25   waking moments with video speeches and other material showing

1    the urging and the part of him lead to him being as involved

2    and Mr. Almonte's preparation for and attempted flight to Egypt

3    to engage in combat on behalf of extremists in Somalia.

4            The Government psychiatrist and psychologist expressed

5    the opinion that Alessa's anti-social personality traits are,

6    in effect, permanent.  And the Government cited an episode of

7    prison violence as evidence that Mr. Alessa and his

8    co-defendant remain violent.  The psychiatric evidence of any

9    untreatable condition was effectively countered by Mr. Alessa

10   and Mr. Almonte's expert, and irrefutable experts established

11   that prior episode was not the result of defendant's

12   aggressiveness, but rather they justifiably were defending

13   themselves against an unprovoked attack against a dangerous

14   inmate with a weapon.

15           Lengthy prison term and intensive psychiatric

16   treatment during this term, plus light supervision thereafter,

17   will ensure that Alessa will not been a danger to the public

18   and will be a deterrent to others, considering all the

19   circumstances, including Alessa's youth and the fact that no

20   injuries to anyone resulted from the failed conspiracy, leaves

21   the Court to conclude that 360 months is greater than necessary

22   to comply with the purposes of Section 3553(a).  This lengthy

23   guideline sentence is terrorism, 12-level increase, and the

24   base level of the automatic classification of the criminal

25   history as 6.  This produces the excessiveness to which

1    reference has been made.

2            The Court concludes that a sentence of 22 years, 264

3    months, is sufficient but not greater than necessary to comply

4    with the purposes of Section 3553(a), and takes into account

5    Alessa's youth, he's emotional instability, and likelihood of

6    treatment in the long run.  This is somewhat longer than the

7    sentence to be imposed upon Almonte.  Alessa was emotional and

8    more deeply involved in Muslim causes, and Almonte demonstrated

9    empathy for other human beings.  Alessa showed little concern

10   for the well-being of others.  Psychiatric treatment will be

11   recommended and supervised release will be imposed for life.

12   And six, restitution is not applicable.

13           The formal sentence will be, it is pursuant to the

14   Sentencing Reform Act of 1984, it is the judgment of the Court

15   that the defendant Mohamed Alessa is hereby committed to the

16   custody of the Bureau of Prisons, to be in prison for a term of

17   264 months.

18           Upon release from imprisonment, the defendant shall be

19   placed on supervised release for the remainder of his lifetime.

20   Within 72 hours of release from the custody of the Bureau of

21   Prison, the defendant shall report in person to the probation

22   office to the district to which he is released.  While on

23   supervised release, the defendant shall not commit another

24   federal, state or local crime; shall be prohibited from

25   possessing a firearm or other dangerous device; shall not

1    possess an illegal controlled substance; and shall comply by

2    the other standard conditions that have been adopted by this

3    Court.

4              Based on the information presented, the defendant is

5    excused from the mandatory drug testing provision.  However,

6    the defendant may be requested to submit to drug testing during

7    the period of supervision, if the probation officer determines

8    a risk of substance abuse.  In addition, the defendant shall

9    comply with the following special conditions.  Computer

10   monitoring.  You shall submit to an initial inspection by the

11   U.S. Probation Office to any unannounced inspection of your

12   computer equipment.  This includes but is not limited to

13   personal computer, personal digital assistance, entertainment

14   consoles, cellular telephones, or any electronic media device

15   which is owned or accessed by you.  You shall allow the

16   installation on computer of any hardware or software system

17   which the monitor computer used.  You shall pay the cost of the

18   computer monitoring program.  You shall abide by the standard

19   conditions of computer monitoring.  Any dispute as to the

20   applicability of this condition shall be decided by the Court.

21             Mental health.  You shall undergo treatment in a

22   mental health program approved by the United States Probation

23   Office until discharged by the Court.  As necessary, said

24   treatment may also encompass treatment for gambling, domestic

25   violence, and/or anger management, as approved by the United

 1    States Probation Office until discharged by the Court.

 2    Probation officer shall supervise your compliance with this

 3    condition.

 4              Prohibition on gang criminal associations.  You shall

 5    refrain from associating with, or being in the company of any

 6    members of any tradition, or nontraditional organized crime

 7    group or any other identified threat group.  You shall be

 8    restricted from frequenting any location where members of said

 9    organizations are known to congregate or meet.  You shall not

10    have in your possession any item, nor paraphernalia which has

11    any significance or evidence of any affiliation with said

12    organizations.

13              You are prohibited from occurring any new credit

14    charges, opening additional credit lines, or incurring any new

15    monetary loan obligation or debt by whatever name known,

16    without the approval of the U.S. Probation Office.  You shall

17    not encumber or liquidate interest in any assets unless it is

18    in direct service of a fine, or unless it is otherwise stated,

19    or in payment after the special assessment, which the debt will

20    the approval of the Court.  It is further ordered that

21    defendant shall pay to the United States a total special

22    assessment of $100, which shall be due immediately.

23              I'm giving to counsel and others the extended

24    statement of reasons for the variance.  It's supposed to go to

25    each counsel.  And then there will be a couple for the press.

1    Yes, one to the U.S. Attorney.

2            In conclusion, I advise you, Mr. Alessa, that subject

3    to any waiver of the right to appeal contained in the plea

4    agreement, you have a right to appeal from the sentence and the

5    judgment and notice of appeal must be filed within ten days.

6    If you do not have the funds to pay a filing fee, the Clerk of

7    the Court will file a notice of appeal on your behalf, and an

8    attorney will be appointed to represent you.

9            With regard to Mr. Almonte, I've reviewed the

10   submissions of counsel, reports of the expert witnesses, heard

11   the argument of counsel, and the statement of defendant here in

12   court in preparation for the sentencing.  The statement of

13   reasons will be the Court adopts the presentence investigation

14   report with the exception noted to certain of the factual

15   findings.  And as to that, I would note, the PSIR relating to

16   Almonte is virtually a duplicate, except a certain paragraph

17   relates solely to Almonte's background and unique events.

18           Almonte does not dispute the guideline calculations.

19   He has submitted an objection to the PSIR, which contain a

20   number of comments contained in the PSIR seeking to portray

21   Almonte in a more sympathetic light.  Paragraph 133 concerning

22   the fracas in the correctional institution where the defendants

23   were being held pretrial, and which has been mentioned in

24   connection with Alessa's objection to PSIR, misstates the

25   significance of the incident.  That is the defendants'

 1    justified resistance to an attempt to extort from them and

 2    their defense in a knife-like attack.  And the PSIR refers to

 3    the violence, depriving both defendants as acceptance of

 4    responsibility.  And the Government points to the defendants as

 5    indicative of the defendants' continuing violent nature.  It is

 6    not a basis for questioning their acceptance of responsibility,

 7    or indicia of continued dangerousness, except as noted above,

 8    and except as the statement of reasons requires.  The Court

 9    accepts the findings of the Alessa and Almonte PSIR.  The

10    calculation guidelines as set forth in each PSIR remain

11    unchanged and are accepted.

12            Second, no count of conviction carries a mandatory

13    minimum sentence.

14            Third, the guideline calculation is as follows.  Total

15    offense level, 42; criminal history category, 6; imprisonment

16    range, 360 months to life; supervised release range, any period

17    to life; fine range, $25,000 to $250,000.  The fine is waived

18    because of the defendant's inability to pay.  The sentence

19    imposed by the Court is below the advisory guideline range in a

20    motion of defendant's to sentence outside, to which the

21    Government objected.  The parties handed out a statement of

22    reasons for this conclusion, but on the record I'll place a

23    summary of those reasons.

24            The Court has stated a detailed statement of reasons

25    why it is granting a variance to Carlos E. Almonte and Mohamed

1    Alessa.   The statement of reasons will be placed on the record
2    before imposition of sentence.   As to Mr. Almonte, it can be
3    summarized as follows.

4          Almonte pled guilty to the most seriousness of crimes,
5    terrorism in the form of a Jihadist to commit murder for
6    religious reasons of individuals outside the United States.
7    The lowest guideline prison term is 360 months.   The preeminent
8    considerations are ensuring that Almonte no longer possess a
9    danger to the community and deterrence of others who might
10   engage in similar conspiracy.

11         The evidence shows that Almonte suffered from serious
12   psychological impairments from earliest childhood.   In later
13   years, although coming from a Catholic family, he's adopted an
14   extreme form of Muslim religion, Jihadism, which called for the
15   death of those who disagreed with it, whether Muslim or
16   non-Muslim.   Almonte saturated his waking moments with video
17   speeches, speeches and other materials showing an urging,
18   martyrdom of the cause.   This lead to Alessa's preparation for
19   and attempted flight to Egypt to attempt to engage in combat on
20   behalf of extremists in Somalia.

21         The Government psychiatrists and psychologists express
22   the opinion that Almonte's anti-social personality traits are,
23   in effect, permanent, and the Government cited an episode of
24   presentence violence as evidence that Almonte and his
25   co-defendant remain violent.   The psychiatric evidence of any

1    untreatable condition was effectively countered by Alessa's,

2    and Almonte's experts and irrefutable evidence establish that

3    the prison episode was not the result of defendants'

4    aggressiveness but rather that they justifiably defended

5    themselves against an unprovoked attack with a dangerous inmate

6    with a weapon.  A lengthy prison term and extensive prison

7    psychiatrist treatment and life supervision thereafter will

8    ensure there Almonte will not been a danger to the public, and

9    will be a deterrent to others.

10          Considering all the circumstances, including Almonte's

11   relative youth, and the fact that no injuries to anyone

12   resulted from the failed conspiracy, leaves the Court to

13   conclude that 360 months is greater than necessary to comply

14   with the purposes of Section 3553(a).  The lengthy guideline

15   sentence is a consequence of the terrorism enhancement.  The

16   12-level increase is the base offense level, and the automatic

17   classification of the criminal history as 6.  Were it not for

18   the terrorism enhancement, Almonte's base offense level would

19   have been 30, his criminal history would have been 1, based on

20   a conviction for underage consumption of alcohol, which leads

21   to a criminal history category of 1.  His sentence range would

22   have been 97 to 121 months.  The Court concludes that a

23   sentence of 20 years, 240 months, is sufficient but not greater

24   than necessary to comply with the purposes of Section 3553(a),

25   and takes into account Almonte's youth, emotional instability,

1    and the likelihood of effective treatment in the long run.

2    This is somewhat shorter than the sentence imposed upon Alessa.

3    Almonte is less deeply involved emotionally than Alessa in

4    Muslim causes, particularly, in Palestinian aspects.  And

5    Almonte shows empathy for other people.  Psychiatric treatment

6    will be recommended and supervised release will be imposed for

7    life.

8              Other restitution is not applicable.  And the formal

9    sentence will be, pursuant to the Sentencing Reform Act of

10   1984, it is the judgment of the Court that the defendant Carlos

11   E. Almonte is hereby committed to the custody of the Bureau of

12   Prison, to be in prison for a term of 240, months.  Upon

13   release from imprisonment, defendant shall be placed on

14   supervised release for the remainder of his lifetime.

15             Within 72 hours of release from the custody of the

16   Bureau of Prisons, defendant shall report in person to the

17   probation office in the district to which the defendant is

18   released.  While on supervised release, the defendant shall not

19   commit another, federal, state, or local crime; shall be

20   prohibited from possessing a firearm or other dangerous device;

21   shall not possess an illegal, controlled substance; and shall

22   comply by the other standard conditions that have been adopted

23   by the Court.  Then you must submit to one drug test within 15

24   days of commencement of supervised release, and at least two

25   tests thereafter, as determined by the probation officer.

1    In addition, the defendants shall comply with the

2    following special conditions.  Computer monitoring.  You shall

3    submit to an initial inspection by the U.S. Probation Office,

4    than to any unannounced examination during supervision of your

5    computer equipment.  This includes but is not limited to

6    personal computer, personal digital assistance, cellular

7    telephone, and/or any electronic device which is owned or

8    accessed by you.

9    You shall not allow the installation on your computer

10   of any hardware or software system with monitor computer use.

11   You shall pay the cost of the computer monitoring program.  You

12   shall abide by the standard conditions of the computer

13   monitoring.  Any dispute as to the applicability of this

14   condition shall be decided by the Court.

15   You shall refrain from socializing with or being in

16   the company of any members of any traditional or

17   non-traditional organized crime group or any other identified

18   threat group.  You shall be restricted from frequenting any

19   location where members of any said organizations are known to

20   congregate or meet.  You shall not have in your possession any

21   item or paraphernalia which has any significance or an y

22   evidence of an affiliation with said organizations.

23   Mental health treatment.  You shall undergo treatment

24   in a mental health program approved by the United States

25   Probation Office until discharged by the Court.  As necessary,

1    said treatment may also encompass treatment for gambling,

2    domestic violence, and/or anger management, as approved by the

3    United States Probation Office until discharged by the Court.

4    Probation officer shall supervise your compliance with this

5    condition.   You are prohibited from incurring any new credit

6    charges, opening additional lines of credit, or incurring any

7    new monetary loan obligation or debt by whatever name known

8    without the approval of the U.S. Probation Office.   You shall

9    not encumber or liquidate interest in any assets or otherwise

10   until the special assessment is paid, unless otherwise

11   authorized by the Court.

12          It is further ordered that the defendant shall pay to

13   the United States a total special assessment of $100, which

14   would be due immediately.

15          I advise you, Mr. Almonte, that subject to any

16   limitations or waiver in the plea agreement, you have the right

17   to appeal from the sentence or the judgment of conviction.   A

18   notice of appeal must be filed within ten days.   If you do not

19   have the funds to pay for the filing fee, the Clerk of the

20   Court will file a notice of appeal on your behalf.   And if you

21   do not have the funds to pay for an attorney, an attorney will

22   be appointed to represent you.

23          Is there anything else we have to do?   No, nothing

24   else?

25          MR. KOGAN:   Well, Your Honor, if we can put on the

 1    record that the defendants have reviewed the PSR, if we can

 2    place on the record that counsel's affirmation and verification

 3    that the defendants, themselves, have received and reviewed the

 4    PSR.

 5              THE COURT:  Mr. Cohen?

 6              MR. COHEN:  Correct, Judge.

 7              MR. PATTON:  We have.

 8              THE COURT:  You've seen and reviewed, and your client

 9    has seen and reviewed the PSR?

10              MR. PATTON:  Yes, Your Honor.

11              THE COURT:  Okay.  I guess THAT will recess the

12    session, and I appreciate THE hard work which has gone into it.

13    That will be it.

14              MR. PATTON:  Your Honor, on behalf of Mr. Almonte, I

15    would ask that you recommend to the Bureau of Prisons THAT he

16    be housed in close proximity, as close as possible, to his

17    family in northern New Jersey.

18              MR. COHEN:  And the same holds true with Mr. Alessa.

19              THE COURT:  Alright.  We'll put on the record that the

20    Court recommends that the place of confinement BE as close as

21    possible to the homes of the prospective defendants.  Alright.

22              (Matter concluded)

23

24

25