UNITED STAES DISTRICT COURT

THIRD CIRCUIT

United States

v.

2-CR. 11-132

Carlos E. Almonte    Pro se


MOTION FOR COMPASSIONATE RELEASE


Petitioner Carlos Almonte brings this motion for compassionate release under 18 U.S.C.§3582(c)(1)(A)(i), as amended by the First Step Act of 2018. Petitioner is raising numerous issues, when viewed together create extraordinary and compelling reasons that warrant a reduction in sentence. These include conditions relating to:

1) Family circumstances, in particular the need to take part in the care of his GrandMother. She requires 24 hour assistance and the family members are unable to care for her.

2) The harsher than-contemplated conditions Petitioner experienced because of the pandemic and his charges.

3) Unusually long sentence

4) Long Covid-effects

5) Post conviction Rehabilitation/3553 Factors


BACKGROUND

On or about June 5th, 2010, Petitioner was arrested in New York for conspiracy in the U.S. to murder individuals outside the U.S. The crime was suppose to take place in the foreign lands but the conspiracy

1.

never came to fruition and the Petitioner was arrested.

In March 2011, he pled guilty and received a lengthy sentence of 20 years and a life time term of supervision.

confinement or home detention in December,20th, 2026.

## ADMINISTRATIVE EXHAUSTION

A defendant may move for compassionate release only after they have fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the Warden of the defendant's facility, whichever is earlier." 18 U.S.C.§3582(c)(1)(A).

Petitioner filed the request to the Warden of FCI Oxford and received the denial of his request August 9;2024. (Please see the attached EX A). Hence, he has satisfied the First Step Act's administrative exhaustion requirement.

2.

LEGAL FRAMEWORK

Today's compassionate release (or sentence reduction) statue was
first enacted as part of the Comprehensive Crime Control Act of 1984.
United States v. Brooker, 976F.3d228,231(2d Cir.2020). As amended in
2018, the statue authorizes a district court to "reduce the term of
imprisonment" for a defendant who meets three requirements: administ-
rative exhaustion, extraordinary and compelling reasons warranting a
reduction in sentence, and a demonstration that the reduction in
sentence is warranted after consulting the factors set forth in 18
U.S.C.§3553(a). 18 U.S.C.§3582(c)(1)(A), as amended by the first Step
Act of 2018.

Congress directed the Sentencing Commission to "describe what should
be considered extraordinary and compelling reasons for sentence reduction
including the criteria to be applied and a list of specific examples,"
with the only limitation being that"R"ehabilitation alone shall not
be considered an extraordinary and compelling reason."id.;28 U.S.C.§
994(t). In November 2023, a SSentencing Commission Policy Statement
providing an updated definition of "extraordinary and compelling reasons"
became effective. See U.S. Sent'g Guidelines ("U.S.S.G.")§1B1.13
{amended Nov 1.2023·.

The latest definition was meant to accord with the First Step Act's
purpose of 'increasing the use' of sentence reduction motions under
section 3582(c)(1)(A). "See United States Sen'g Commission, Amendments
to the Sentencing Guidelines, Policy Statements, Official Commentary,
and Statutory Index at 6, https://www.ussc.gov/sites/default/files/
pdf/amendment-process/official-text-amendments/202305_Amendments.pdf
[hereinafter "Nov.1,2023 Amendments to U.S.S.G1 (citing First Step
Act §603(b)).

3.

In sum, the new definition provides defined circumstances in which a court shall find a sentence reduction is warranted, U.S.S.G.§1B1.13 (b)(1)-(4), and clarifies that district courts retains significant discretion in determining whether to grant or deny a motion for sentence reduction, id.§1B1.13(b)(5); see also

The 3553(a)Factors.

After finding the defendant has met the administrative exhaustion and extraordinary and compelling reasons requirements, the court must consider the factors set forth in 18 U.S.C.§3553(a)(to determine whether and to what extent a reduction in sentence is warranted. § 3582(c)(1)(A).

These factors include, among others:

(1)the nature and circumstances of the offense and the history and characteristics of the defendant;[and]

(2) the need for the sentence imposed -III.

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D))to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C.§3553(a)(1)-(2). A court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Id. at §3553(a)(6).

The policy statement provides        specific examples of what
establishes an extraordinary and compelling reason. These examples
include those premised on:(1) a defendant's medical circumstances, U.S.S.G.
{!B1.13(b)(1) ; (2) a defendant's age, id.§|B|/13(b)(2);(3) a defendant's
family circumstances, id.§1B1.13(b)(3); and (4) abuse suffered by the
defendant while in custody, id.§1B1.13(b)(4). Each example includes
specific requirements that, when met, would allow a reduction in sentence
if warranted after the court reviews the 28 U.S.C. §3553(a) factors.
The new definition also includes a catch-all provision authorizing the
court to consider "Other Reasons" that demonstarte extraordinary and
compelling reasons warranting a reduction in sentence. U.S.S.G.§ 1B1.
13(b)(5). Under this provision a sentencing court may find that this
standard is met if "[t]he defendant presents any other circumstances
or combination of circumstances that, when considered by themselves
or together with any of the reasons described.in paragraphs (1)
through (4), are similar in gravity to those described in paragraphs
(1) through (4)."Id. The Commission "considered but specifically
rejected a requirement that 'other reasons' be similar in nature and
consequence to the specified reasons." See Nov.1,2023 Amendments to
U.S.S.G. at 10 (quoting First Step Act § 603(b) (emphasis added)).
"Rather, they need be similar only in gravity, a requirement that
inheres in the statutory requirement that they present extraordinary
and compelling reasons for a sentence reduction." Id. The Commission
also noted the unique position judges are in "to determine whether
the circumstances supports a sentence reduction are best left to the

reviewing court. This provision, U.S.S.G. §1B1.13(b)(5), therefore affords the court significant discretion to determine when a reduction is warranted.

The Policy statement also clarifies that any circumstances establishing extraordinary and compelling reasons warranting a reduction need not have been "unforseen at the time of sentencing."U.S.S.G.§1B1.13(e). "Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement."

"Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C.§994£t·; see also U.S.S.G.§1B1.13(d). However, a defendant's rehabilitation "may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted. "U.S.S.G.§1B1.13£d·. In addition, an unusually long sentence" may be considered in determining whether the defendant demonstrates an extraordinary and compelling reason only (1) a defendant has served at least 10 years of their term of imprisonment; (2) there has been a change in law; and (3) the change in law would "produce a gross disparity" between the sentence being served and sentence that would likely be imposed at the time the motion was filed. U.S.S.G.§ 1B1.13(b)(6). Except as provided in U.S.S.G.§1B1.13(b)(6), "a change in the law" may also generally not be considered for the purposes of determining whether extraordinary and compelling reasons exist.Id§1B1.13 (c). However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction[;]"a change in law may still be considered when determining the extent of any reduction.

1) Petitioner's GrandMother  Needs Round the Clock Care.

Petitioner's GrandMother Eulogia Almonte who is 93 years old needs round the clock assistance. Her condition has deteriorated due to dementia and the family is having extremely hard time to provide care for her. Currently, her daughter Aide M.Almonte is providing her the care but it has become difficult for her due to her Rheumatoid Arthritus and chronic hypertension. She sure could use some help and Petitioner can be of great assistance because it is a fact that no one person can take care of an elderly 24 hours a day. Petitioner would be able to help his aunt in taking care of his Grand-Mother whom he loves dearly and she practically raised him. Moreover, his aunt gets tired because the Grandmother does not want to use diapers and hence she has to stay up most of the nights to help her use the bathroom.

Furthermore, dementia has resulted in mood swings and it is extremely difficult for one person to take care of her. The family cannot afford nursing home and it is the wish of the GrandMother to spend her last days with the family. The family members are willing to help the petitioner if he is granted home confinemnet to care for his GrandMother.

Please see the letters from Petitioner's Mother and Father (EX B).

Also see the letter from his Aunt (Ex C).

Petitioner is asking this court to give a chance to help his GrandMother and his family by doing something positive, it would be giving back to the family as well as to the community after this conviction and a lenghty incarceration. It must be noted that the petitioner has a very good relation ship with his GrandMother and she misses him and calls his name when she

is not suffering from dementia. She has told other family members that she is going to wait for her grandson and she wants to see him before she dies.

The court has the authority to reduce the sentence to time served or home confinement. Petitioner has completed nearly 90% of his time and time served or home confinement would allow him to care for his GrandMother.

Courts have held that family circumstances are not limited to the defendant's children and spouses under the most recently amended Policy Statement, which took effect on November 1,2023, Section 1B1.13(b) states "extraordinary and compelling reasons" exist under any of the following circumstances or a combination thereof; under 3(d) the defendant establishes that circumstances similar to those listed in paragraphs(3)(A) through (3)(C) exist involving any other immediate family members or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only availablr care giver for such family member or individual. For purposes of this provision, "immediate family member" refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grand parent, or sibling of the defendant.

Ivory Wright's stepfather was in failing health, and he was the only available caregiver. the court granted Wright's compassionate release motion. <u>United States v. Wright, 2022 U.S.Dist.LEXIS 40176, at *12</u> (S.D.Calif.Mar. 7,2022). Everett Jenkins' 87-year-old mother and 92-year father were in failing health. Jenkins was the only available caregiver. The court granted Jenkins compassionate release. <u>United States v. Jenkins 2021 U.S.Dist.LEXIS 213595, at *10 (D.Md.Nov.4,2021)</u>.

Courts have stated in dicta that if a defendant "[met] his burden"

of showing that "he was the only available alternative caregiver" when an existing caregiver was rendered incapable of providing such care, it could be "unreasonable not to find an extraordinary circumstance warranting compassionate release."United States v. Laureti, 2021 U.S.App.lexis 17522, at *4 (11th Cir.June 11,2021). petitioner submits that his grand-mother is incapacitated, he would be essential to provide care for her along his aunt who is unable to do it 24 hours a day, and this court has the authority to grant compassionate release.


2) The Harsher than-Contemplated Conditions Petitioner Experienced Because of The Pandemic And His Charges.

Conditions at the BOP facilities were deplorable during the covid-19 pandemic. The Courts are well aware of BOP's draconian measures trying to curb the spread of covid-19. The defendant endured extremely punitive conditions at the BOP facilities since his incarceration which includes frequent lockdowns, no visitation and no programming. Further, the petitioner spent many years in solitary confinement and (CMU) special management units with extremely difficult and hard conditions.

The courts have recognized that conditions of incarceration during the pandemic have been severe, including "onerous lockdowns," United States v. Hatcher, No 18-CR-454-10 (KPF), 2021 U.S.Dist.LEXIS 74760,2021 (S.D.N.Y. Apr.19,2021), the"curtailment of facility programming and visitation," United States v. Oquendo, No 13-CR-357-1 (KPF), (S.D.N.Y. Jan 17,2023), and outbreaks made worse by the difficulties of social distancing in prison-which have left inmates suceptible to and fearful of serious illness

9.

or death." Johnson, 2023 U.S.DIST.LEXIS 72906, 2023 WL 3093617, at *10.
The courts in this circuit and others have therefore found support for a
reduction in sentence for defendants who have "demonstrated that their
imposed sentence was more severe than originally intended, due to the
pandemic."Id.

The Petitioner on the other hand has endured more severe incarceration
due to his terrorism charges. In other words he had a double whammy, it
is a well known fact, that  inmates with terrorism charges have a difficult
time in the prison system. They are discriminated against by the staff
members and inmates alike. Petitioner would like to bring it to the courts
attention how he has served his time during his incarceration and the
conditions.

### History of Petitioner's Incarceration.

Petitioner was first arrested on the nights of june 5th 2010. He was at
the JFK Airport. After his processing by the FBI he was placed in the
solitary confinement in Hudson County jail for 2 nights. On June 7th he
appeared before the federal Judge in Newark and after that he was placed
in the SHU (solitary confinement) in MDC Brooklyn. He stayed there for a
year in solitary confinement by himself. He was in the cell for 23 hours
Monday-Friday and 24 hours during the weekends. He was escorted by 2 guards
and a lieutenant which is called a 3 man move. After he pled guilty he was
reunited with his co-defendant and they stayed in the solitary for 13 more
months. On April 2012, after 22 months in the solitary confinement he
and his co-defendant were taken to general population. After 3 months in
the general population during Ramadan a known drug dealer tried to extort

them with a jail house weapon known as shank and threatened to use it
if they did not give him their commissary. Thereafter they fought with
the guy which resulted in another 9' months in the solitary confinement.
They after serving 9 months inthe SHU went back to the General population.
Then petitioner and his co-defendant were seperated and ended up in
CMU at Marion IL. CMU are special units assigned with extreme restrictions
i.e. only 2 phone calls a week, the visitation is behind the glass with
a phone. Plus visitation is merely impossible due to the distance and his
parents,siblings,friends and other family members are all from the East
Coast and Marion was in the mid-west. Further, e-mails and regular mail
was heavily screened which resulted in extremely long delays and one finds
it better not to write in these conditions. He was in Marion CMU from July
2013 until late November of 2014. Then he was swapped with his co=defendant
who was sent there and the petitioner went to CMU in Terre Hautte IN.
Both of these CMU's are very small with no recreation yards and alot
of restrictions. He was there for 8 months and then again swapped with
his co-defendant who ended up back in Terre Haute and the petitioner went
back to Marion IL CMU. It must be noted that these transfers were not due
to any disciplinary infraction. They were just made because the BOP decided
to do it without any justification. Then in September he was sent to USP
Marion. Here, there is another note worthy thing to mention that CMU at
Marion and Terre Haute had a policy that after serving six months in
those conditions inmates can be transferred closer to home. In April,2016
he was told that he would be transferred closer to home and instead was
sent to FCI Berlin which is 7-8 hours from his residence. Instead of
transferring him to Fairton or Schukyill,PA. After arriving at FCI Berlin

he was assigned Red card after 2 weeks. Red card check in is that an
inmate has to check in with the staff in his case he was suppose to check
in every 2 hours. This is extremely harsh as one can imagine that there
is no way a person can get rest or sleep if he/she has to check in every
2 hours. And when an inmate is sick or cannot make it he is thrown into
the solitary confinement. He stayed under the Red card check in for 8
months (5/2016 --- 1/2017). On top of that the staff discriminated against
him on a regular basis because of his religious preference. Eventually,
he and his cell mate were placed in the solitary confinement because of
the Muslim community investigation. He did not receive any disciplinary
infraction but still ended up in the CMU. After spending few months in
the SHU, he ended back in Marion IL CMU. His case manager and IRS
(Intelligence Research Specialist) which runs the CMU were surprised and
told him that they never expected him to return. It is worth noting that
he had no incident report other than a minor infraction of walking on the
grass. Hence he spent from June 2017 to January 2020. In March of 2020
Covid crises took place and hence his punishment was more than punitive.
He contracted Covid-19 3 times. He spent 17 months in covid lock downs.
Finally, in May 2021, he was sent closer to home to Fairton N.J, he was
quarantined for 3 weeks and then sent to the General population. This
was the first time he received visits and was able to see his parents
and siblings and other family members.FCI Fairton was also on modified
operations for 1 year until may 2022. He was transferred again from Fairton
after 2 years and 8 months and was sent to Oxford,Wisconsin. Once again
he is far away from home.

12.

The Petitioner wanted to bring the above to the courts attention because the extreme conditions he endured during his incarceration amounts to extraordinary and compelling reasons and the court should take this into consideration. It is a known fact that solitary confinement has many psychological effects on a human psyche and many industrialized nations have outlawed this type of punishment. But for a young man of 24 years of age this type of continued punishment for over 10 years amounts to cruel and unusual punishment and therefore, the petitioner requests that this court take the above conditions and facts into considerations.

3) The Extraordinary Length of The Defendant's sentence.

Defendant was 24 years old when he made the mistake of committing this crime. It was a conspiracy to commit certain acts in a foreign nation, However, it was a serious lapse of judgement. It must be noted that prior to this defendant had a clean record and never committed any crime. One can surmise that defendant's behavior was aberant and that aberation is long gone. Among the extraordinary and compelling reasons courts have cited when considering compassionate release motions post Brooker is the severity of a defendant's sentence, especially relative to his actual criminal behavior.

For instance, defendantsswho were given extremely long sentences under the then mandatory Sentencing Guidelines, despite their minimal participation in a drug enterprise, have been granted compassionate release based in part on the perceived unfairness of their original sentence. So have defendants who were sentenced under subsequently invalidated laws or practices.

See, e.g., United States v. Vargas, 502 F. Supp. 3d 820, 826-27 (S.D.N.Y. 2020)(collecting cases) : United States v. Parker, 461 F. Supp. 3d 966,985 (CD.Cal.2020) (considering "the severity of [defendant's] life sentence, imposed under a sentencing regime that is no longer valid," as part of the extraordinary and compelling reasons justifying compassionate release); United States v. Haynes, 456 F.Supp.3d 496, 514 (E.D.N.Y.2020) (deeming the brutal impact of [defendants] original sentence" and its harshness as compared to sentences imposed on similar and even more severe criminal conduct today to be an extraordinary and compelling reason warranting relief);

United States v. Marks, 455 F.Supp. 3d 17,36 (W.D.N.Y.2020)
(holding that, while the retroactivity provisions of the FSA did not
apply directly to defendant, the FSA still "evidences Congress's
intent to mitigate the harsh and sometimes unjust effects of the
sentencing laws");

United States v. Redd, 444 F.Supp. 3d 717, 722-24 (E.D.Va.2020)
(finding discrepency between defendant's 603-month sentence-imposed
under mandatory Guidelines and prior practice of stacking §924(c)
charges- and modern sentences for same conduct to constitute
extraordinary and compelling reason justifying compassionate release);
See also; United States v. Curtis, No.03-CR-533, 2020 U.S.DIST.LEXIS
70804, 2020 WL 1935543, at *3 (D.D.C.Apr.22,2020)(considering
harshness of defendant's sentence in evaluating the §3553£a· factors).

The fact that a lengthy sentence was compelled by the government's
informer and his manipulation of the facts in connection with the
conspiracy has been held to be relevant when considering whether a
sentence qualifies as unduly harsh-even though such a sentence was
not illegal.

Here, however, the Government-in its understandable zeal to
identify and capture individuals who would do harm to individuals
outside the United States in foreign lands used an unscrupulous
operative to inveigle a 24 year old young man into agreeing to commit
serious terrorism related offenses that the defendant and his co-
defendant who was also very young at the time could have never dreamed
up on their own.

But the fact that what the government did was legal does not make it
just, as the late scholar and Judge Richard Posner suggested in

15.

United States v. Kindle, 698 F.3d 401,414 (7th Cir.2012).(twenty five years quarter of a century---is a very long time indeed, especially where...) as here , there was no actual danger to anyone.

In United States v. David Williams , Onta Williams and Laguerre Payen, U.S.Dist.LEXIS 129978 (S.D.N.Y.2023), Judge Colleen McMohan chastised the government stating" a person reading the crimes of conviction in this case would be left with the impression that the offending defendants were sophisticated international terrorists committed to jihad against the United States. They were in, in reality, hapless, easily manipulated and penurious petty criminals)...(Nothing about the crimes of conviction was of defendant's own doing. The FBI invented the conspiracy; identified the targets; manufactured the ordnance; fertilized what would otherwise have been a state crime (the Bronx "bomb" plot) by driving three of the four men into Connecticut to view the "bombs" and stinger missile launchers" that would be used in the operation; and picked the day for the mission (which was filmed in real time so it could be shown on television news the night men were arrested). The defendants in "Williams" had served 14 years of their 25-year sentence and the compassionate release was granted.

## 4) Long Covid-19 Effects

Petitioner has contracted the Covid-19 virus three times despite being vaccinated. The result is that he still suffers from covid effects i.e shortness of breath, taste buds are not 100% and getting tired despite being a young man. There is nothing the BOP can do regarding these symptoms since the rest of the world has not figured any remedy for these long covid symptoms. Hence, the petitioner is suffering from Covid. Despite being fully vaccinated and boosted, medical experts state that it is impossible to surmise exactly how likely petitioner is to become ill again, but recent studies indicate that there are significant changes of a person developing long-term health impacts after contracting COVID. United States v. Stephens, 2022 U.S. 30655 (D.Mont.Feb.22,2022). Numerous courts have released prisoners based on the long-term effects of COVID. United States v. Martinez,2022 U.S.Dist.LEXIS 7280 (S.D.Cal. Jan.13,2022) (Martinez was released because of the prison conditions and the possibility he would again contract COVID); United States v. Yellin, 2020 U.S.Dist.LEXIS 112786 (S.D.cal.June 20,2020) (Yellin was released because it was not known how long COVID immunity lasts).


## 5) Rehabilitation

18U.S.C. §3553(a)(1) - the nature and circumstances of the offense and the history and charecteristics of the defendant.

A. Nature and Circumstances

The nature and the circumstances of this case were serious  Petitioner does not seek to justify, dimminish, or detract from the seriousness of his offense, and he unequivocally accepts responsibility for his conduct. However, he is needed at home by his GrandMother and the family.his

aunt is unable to provide care for her.

B. History/Characteristics of Defendant

Petitioner has served more than 90% of his sentence, with good time credits, and his release date to the RRC is in 2026. His rehabilitative efforts are relevant to his "the history and characteristics." Pepper v. United States, 562 U.S.476,491 (2011)(citing 18 U.S.C. §3553 (a)(1)). Numerous courts have considered a defendant's rehabilitation in granting compassionate release. United States v. Brown, 2020 U.S. Dist.LEXIS 87133, at *12,17-18 (S.D. Iowa Apr.29,2020); United States v. Decator, 2020 U.S.Dist.LEXIS 60109, at *10 (D.Md.Apr.6,2020); United States v. Redd, 2020 U.S.Dist. LEXIS 45988, at *23 (E.D.Va.Mar. 16,2020); United States v. Perez, 2020 U.S.Dist. LEXIS 45635, at *7 (D.Kan.Mar.11,2020)(finding that inmate's rehabilitation favored compassionate release where inmate "gained his GED while in prison and has availed himself to various educational programs.").

C. 18 U.S.C. §3553(a)(2)(B)- the need to afford adequate deterrence to criminal conduct.

As a result of his offense Petitioner is on life-time supervision. In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that "the certainty of being caught is a vastly more powerful deterrent than the [severity of the] punishment." United States v. Browning, 2021 U.S.Dist.LEXIS 38058, at *12-13 (E.D.Mich.Mar.2,2021).

Browning quotes the findings made by the United States Department of Justice(DOJ) article entitled, "Five Things About Deterrence 1, at 12-13 (2016), which states:

> Severity refers to the length of a sentence. Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms

produce only a limited deterrent effect.

Certainty refers to the likelihood of being caught and punished for the commission of a crime. The research underscores the more significant role that certainty plays in deterrence than severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.

See also Daniel S. Nagin, detterence in the Twenty-First Century, 42 CRIME & JUST. 199, 201 (2013)("[T]here is little evidence of a specific detterent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased [by longer sentences].").

D. 18 U.S.C. §3553(a)(2)(C)- the need to protect the public from further crimes of the defendant.

Petitioner has a BOP First Step Act (FSA) Recidivism Risk Assessment (RRA) Prisoner Assessment Tool targeting Estimated Risk and Needs (PATTERN) score of low and is housed at a low facility. Nathan James, a Congressional research Crime Policy Analyst, writes that "[t]he assessment of offender risk was originally a matter of professional judgment. "See Risk and Needs Assessment in the federal Prison System 2018. however, "[b]ecause courts and correctional officials make decisions every day about who can safely be diverted from incarceration or granted early release, they may benefit from....[a]ctuarial risk assessment tools." Id. although "risks and needs assessment tools are not 100% accurate... the best models are usually able to predict recidivism with about 70% accuracy."Id.

Numerous courts have considered a defendant's PATTERN score when reducing sentences. United States v. Bell, 2021 U.S.Dist.LEXIS 43744 at *10 (S.D. Miss. Mar.9,2021); United States v. Hansen,2020 U.S.Dist LEXIS 230835, at *16 (W.D.Tex. Dec.9,2020); United States v. Carter, 2020 U.S.Dist.LEXIS 206919 (W.D.Pa.nov.5,2020); United States v. Taylor, 2020 U.S.Dist. LEXIS 193381, at *9 (E.D.La. Oct. 9,2020).

## REENTRY PLAN

Upon release petitioner would reside at at 7918 35th Street Baltimore MD 21237. He would be helping his aunt in taking care of his Grand-Mother Eulogia and further his studies in HVAC, electronics and work part-time to support himself.

## DANGER TO SOCIETY

Petitioner is housed at a low federal prison with the risk patternoof low, recidivism low and low violent score. He is not a risk to anyone and has been a model prisoner for a decade. He poses no danger to any person or the community, he knows the consequences of any type of misbehavior, and he would never put himself, or the public in jeopardy.

In the case of United States v. Marks, 455F.Supp.3d 17 (W.D.N.Y.2020), the court found that any risk of danger associated with a sentence reduction "can be mitigated by supervised release." In United States v. Williams, 2020 U.S.Dist. LEXIS 63824, at *9 (N.D.Fla.Apr.1,2020), the court noted with respect to Williams' motion for compassionate release, that while "the court cannot conclude....that he poses no risk at all to public safety...the risk of him engaging in further criminal conduct is minimal and can be managed through...the terms of his supervised release." See also United States v Mondaco, 2020 U.S.Dist

20.

LEXIS 37483, at *13 (S.D.Calif.Mar.3,2020), the court noted that the inmate's compassionate release posed minimal danger because the inmate "will be supervised by the probation Department upon his release from custody through a five-year term of supervised release." For all practical purposes, in determining whether a defendant poses a danger, their progress toward rehabilitation is an important consideration. United States v. Seals, 509F.Supp.3d 259,264 (E.D.Pa.2020).

At sentencing, the Court imposed a term of life-time supervision on the petitioner. Considering his maturity along with his efforts towards rehabilitation, as well as his exceptional good conduct while in prison, it is almost a certainty he will never engage in any type of further criminal activity when he is released from incarceration.

The court cannot undo the past and is instead tasked with assessing Almonte's (petitioner) dangerousness. In doing so, it must look beyond the underlying offense to his conduct while incarcerated. Douglas, 2021 U.S.dist.LEXIS 10755, at *23; see also, Brown v. United States, 2020 U.S.Dist. LEXIS 238008, at 817 (D.Md.dec.17,2020)(defendant's "behavior for the past 20 years, while in BOP custody, is an important indicator of whether he remains a danger to the community."). United States v. Seals, 509F.supp.3d 259,264 (E.D.Pa.2020)("But for all practical purposes, in determining whether a defendant poses a danger, their progress toward rehabilitation is an important consideration.").

In United States v. Jacobs, 470 F.Supp.3d 969,977-978 (S.D.Iowa 2020), the court stated noncustodial sentences curtail "prized liberty interests" and "the conditions" attached to such a sentence. In United States v. Gall, 374 F.supp.2d 758,763 (S.D.Iowa 2005), rev'd, 466 F.3d 884 (8th cir.2006), rev'd,552 U.S.38 (2007). Such restrictions also promote respect for the law, protect the public, and do not constitute any endorsement of petitioner's conduct.

PROGRAMMING/VT TRAINING

Petitioner has programmed extensively despite the frequent lockdowns and solitary confinements. (See Ex C, progress report).
He has completed these programs despite being charged with the crimes which do not allow him to take advantage of the programs. Such as FSA good time credits. He programs solely for personal growth to work on self, and to make healthier decisions in the future. Court's task here is not to assess the correctness of the original sentence it imposed. Rather, its task is to determine whether 3553(a) factors counsel against a sentence reductions in light of the new, extraordinary circumstances identified. The text and logic of 3582(c)(1) make plain: a sentence reduction is not inconsistant with the 3553(a) factors solely because an incarcerated person has only served a small portion of his sentence. Section 3582(c)(1) permits a district court to reduce a sentence in "any case" not just cases where a sentence has been substantially served; not just in cases involving low-level or non-violent offenses.

See United States v. Gonzales, 520 U.S.1,5,117 S.Ct.1032,137 L.Ed 132 ("read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'".)(quoting webster's third new international dictionary 97 (1976). When a statue provides for relief in "anycase", there is no basis for categorically limiting that relief to a subset of cases. see Id. (holding that there was "no" no basis in the text" for understanding "any other term of imprisonment" to only refer to federal sentences); See also Ali v. Federal Bureau of prisons, 552 U.S. 214,220, 128 S.Ct.831,169 L.ed. 2d 680 (2008) (finding that Congress' use of the word "any" was most naturally understood as meaning "of whatever kind");

22.

Citizen's Bank of La. v. Parker, 192 U.S.73,81,24 S.Ct. 181,48 L.Ed.
346 (1904) ("The word any excludes selection or distinction"). The
Supreme Court reminds us that courts must give effect to each word in a
statue, Setser v. United States, 566 U.S.231,239,132 S.Ct.1463,182 L.Ed.
2d 455 (2012), appreciating that "Congress says in a statue what it means
and means what it says there. Harford Underwriters Ins.Co. v. Union
Planters Bank, N.A., 530 U.S.1,6,120 S.Ct.1942,147 L.Ed 2d 1 (2000).
The breadth of 18 U.S.C.3582(c)(1)'s text not to discount the seriousness
of some criminal offenses is understandable, but to give effect to the
policy choice that Congress made plain: when extraordinary and compelling
circumstances exist, even most serious offenders may be eligible for
mercy.

Moreover,the District courts cannot fulfill its duty to consider the
3553(a) factors by merely recounting the considerations that supported
the original sentence. section 3582(c)(1) necessarily envisions that
the 3553(a) factors may balance differently upon a motion for
compassionate release than they did at the initial sentencing. An
individual requesting compassionate release will, in all cases, be
serving a sentence that a district court once held was "sufficient but
not greater than necessary". If a district court's original 3553(a)
analysis could always prove that a sentence reduction would intolerably
undermine the 3553(a) factors, then 18§U.S.C.3582£c·£1· would, in
effect be a nullity. Also there is good reason to believe that, in
some cases a sentence that was "sufficient but not greater than
necessary" before the corona-virus pandemic may no longer meet the
criteria. A day in prison under corona-virus lockdown is a qualitatively
different type of punishment than one day in prison used to be.

Petitioner is not the same person who stood before the court for sentencing and he does not pose any type of threat to any individual or society at large. The impact of his confinement has been one of nightmare proportions. His adjustment has been a very difficult one, due to his charges but he has made the best of all given situations. He respects all law enforcement personnel, including Bureau of Prison staff who would concur that he has exuded exemplary behavior. The court may reduce the sentence to time served and modify the term of supervised release to include home confinement United States v. Brown,2021 U.S.Dist LEXIS 91312 (W.D.Pa.May 13,2021.

Please see the Petitioner's letter to this court Exhibit (D).

### CONCLUSION

Almonte presents extraordinary and compelling reasons in support of compassionate release as envisoned by the passage of the First Step Act. Granting a reduction in sentence would not undermine the goals of sentencing under 18U.S.C.§3553(a) and is consistent with any policy statements. He poses no danger whatsoever to the community. WHEREFORE, In the interest of justice, the court should conclude that it is unnecessary punitive to keep Almonte imprisoned any longer, and he respectfully moves the court to reduce his sentence to time served, and, if this court deems it necessary, modify the supervised release term to include home confinement.

Respectfully submitted,

Carlos E. Almonte
Defendant pro se

24.